**M & M LEASING CORPORATION, Goodway Leasing, Inc., Bill Pierre Leasing, Inc., Budget Rent-a-Car of Washington-Oregon, Plaintiffs-Appellants,**

v.

**SEATTLE FIRST NATIONAL BANK, a National Bank, Firstbank Leasing Corporation, a Washington Corporation, James E. Smith, Comptroller of the Currency of the United States, Defendants-Appellees.**

**M & M LEASING CORPORATION, Goodway Leasing, Inc., Bill Pierre Leasing, Inc., Budget Rent-a-Car of Washington-Oregon, Plaintiffs-Appellees,**

v.

**PEOPLES NATIONAL BANK OF WASHINGTON, a National Bank, Peoples Leasing Company, a Washington Corporation, James E. Smith, Comptroller of the Currency of the United States, Defendants-Appellants,**

**James E. Smith, Comptroller of the Currency of the United States, Defendant-Cross-Appellant.**

**Nos. 75–2576 and 75–2577.**

United States Court of Appeals, Ninth Circuit.

Nov. 4, 1977.

Rehearing and Rehearing En Banc Denied Dec. 23, 1977.

John P. Lycette, Lycette, Diamond & Sylvester, Seattle, Wash., for plaintiffs-appellants.

Anthony J. Steinmeyer, Atty., Appellate Section, Civil Division, Dept. of Justice, Washington, D. C., Bradley C. Diggs, Seattle, Wash., for Seattle First National.

Before KOELSCH and SNEED, Circuit Judges, and RICHEY,* District Judge.

SNEED, Circuit Judge:

Appellees, Seattle First National Bank (Seafirst) and Peoples National Bank of Washington, are engaged in the leasing of motor vehicles and other personal property. Appellants, M & M Leasing Corporation, Goodway Leasing, Inc., Bill Pierre Leasing, Inc., and Budget Rent-a-Car of Washington-Oregon, Inc., are independent corporations engaged principally in motor vehicle leasing. Defendant-cross-appellant is the Comptroller of Currency of the United States.

Appellants, plaintiffs in the trial court, sought a declaration that the appellees' leasing of motor vehicles and other personal property was not authorized by 12 U.S.C. § 24 (Seventh),[1] despite the fact that it is sanctioned by the Comptroller of the Currency.[2] Appellants also requested an injunction barring appellees and their subsidiaries from further motor vehicle leasing activities. Moreover, appellants asserted that, even if the Comptroller's rulings relied upon to sanction appellees' activities are valid, such activities exceeded the authorization the rulings provided and should be enjoined to that extent.

The trial court in an able opinion distinguished between motor vehicle lease transactions in which the banks *do not* assume the risk of residual value fluctuation upon termination of the lease (so-called "open end" leases) and those in which the banks *do* assume such risk (so-called "closed end" leases). In its initial judgment the trial court enjoined the appellees "from engaging in motor vehicle lease transactions in which the banks assume the risk of residual value fluctuation upon termination of the lease" (II C.R. 575) and declared the Comptroller's interpretive rulings, 12 C.F.R. §§ 7.3400 and 7.7376, invalid to the extent they authorized such leases.

None of the parties was entirely satisfied by this disposition of their dispute. The appellee banks moved to clarify the opinion and judgment to remove "closed end" leases in which there is to be a "full payout" prior to termination of the lease from the scope of the trial court's injunction and to delete the words "motor vehicle" from the language of the injunction. The appellants thought the court's injunction should embrace all leasing and the Comptroller of Currency indicated displeasure with the restrictiveness of the trial court's opinion and injunction.

The trial court in due course amended its injunction to delete the words "motor vehicle" so that it currently reads "from engaging in lease transactions in which the banks assume the risk of residual value fluctuation upon termination of the lease." (II C.R. 598). Also, by order, the trial court

---

* Honorable Mary Anne Richey, United States District Judge, for the District of Arizona, sitting by designation.

1. The pertinent portion of 12 U.S.C. § 24 (Seventh) is as follows:

"To exercise by its board of directors or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, bills of exchange, and other evidence of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal property; and by obtaining, issuing, and circulating notes according to the provisions of this chapter.
. . . ."

2. The authorization appears in 12 C.F.R. § 7.3400 and is as follows:

"A national bank may become the owner or lessor of personal property acquired upon the specific request and for the use of a customer and may incur such additional obligations as may be incident to becoming an owner and lessor of such property. Lease transactions do not result in obligations for the purpose of 12 U.S.C. 84. Since the lease payments are in the nature of rent rather than interest, 12 U.S.C. 85 and 86 are not applicable."

12 C.F.R. § 7.7376 authorizes an operating subsidiary of a national bank to "lease property."

construed its opinion and judgment as follows:

"Lease transactions in which the lessor bank, during the initial lease term, is repaid the cost of the property leased, plus the cost of financing the transaction, in the form of rentals, tax benefits and/or the guarantee of a financially responsible guarantor, are neither disapproved in the Court's opinion nor enjoined by the judgment entered herein." (II C.R. 596).

These modifications satisfied the appellees but, of course, neither the appellants nor the Comptroller. Hence, this appeal was taken by them. We affirm in part and reverse in part.

■ In essence, we view the trial court's holding as correct, so far as it goes, but somewhat more restrictive than the law requires. As we see it, the "business of banking," which 12 U.S.C. § 24 (Seventh), authorizes the appellees to conduct, includes leases of personal property when, in the light of all relevant circumstances, the transactions constitute the loan of money secured by the properties leased. A transaction may be so characterized, in our opinion, even if it is designed so that the lessor bank does not recover during the initial lease term every penny of the cost of the leased property plus its financing costs. A lease ceases to be a secured loan when the lessor assumes material burdens other than those of a lender of money and is subject to significant risks not ordinarily incident to a secured loan. The bright line traced by the trial court provides a sound guide by which leases can be kept within the scope of the "business of banking." We are not, however, prepared to say that the trial court's bright line constitutes the precise outer limit of the "business of banking."

To support our holding, we first will describe the nature and scope of national banks' involvement in the leasing of personal property, we will next analyze the term "business of banking" and apply the analysis to such leasing, and, finally, we will identify some of the characteristics of leases which lie beyond the outer limits of the "business of banking."

## I

### Leasing By National Banks.

The record of this case indicates that the role of national banks, such as Seafirst and Peoples, in personal property leasing generally is essentially that of a financing agency. To illustrate this it is useful to divide personal property leases into motor vehicle leases and leases of aircraft, ships and other so-called "big ticket" items.

Motor vehicle leases usually, but not invariably, are generated by automobile dealers. Particular dealers will enter into an agreement with a bank under which dealers will lease automobiles to their customers. The major terms of a lease, i. e., make, model, accessories, term, and payment schedule, are fashioned by the dealer in a manner that fits his and the customer's interests and conforms to the lease design envisioned by the dealer's arrangement with the bank. To protect itself against improvident leases the bank possesses the right to review both the substantive terms of a lease and the credit-worthiness of the lessee before accepting the lease. The crucial items reviewed are the credit rating of the customer and the vehicle's residual value. Upon accepting the lease the lessee-customer is notified and instructed to make lease payments to the bank. The title of the vehicle shows the bank as the legal owner, while the customer is listed as registered owner and lessee. Customers who approach the bank initially are usually referred to dealers with whom the bank has leasing arrangements.

The bank functions somewhat differently with respect to "big ticket" items. With respect to them, generally the customer calls the bank directly and expresses an interest in leasing particular personal property. This contact essentially is to inquire about the availability of credit. The bank performs no procurement function. The customer chooses the property he wishes to lease, selects a vendor and negotiates with him the terms of the purchase. Assuming

the bank finds the customer an acceptable credit risk, it then purchases the property and leases it to the customer. Delivery by the seller is made directly to the customer-lessee who makes the lease payments to the bank.

Both motor vehicle leases and "big ticket" leases provide that the burdens of operating costs and risks are borne by the lessee. Thus, the lessee agrees to purchase insurance sufficient to cover the bank's interest, to pay all repairs and maintenance, and to assume the risk of loss or damage.

Motor vehicle leases and "big ticket" leases frequently differ, however, in certain important respects. Foremost is the difference in the lessee's responsibility at the expiration of the initial term of the lease. Motor vehicle leases, for example, include a guarantee by the lessee that the vehicle will have a certain residual value at the expiration of the usual two or three year term.

This residual value is simply the anticipated resale value of the vehicle at the lease's termination. Should resale value in fact be less than the guaranteed residual value, the lessee must pay the difference. Should it be more, the excess when realized is refunded to the lessee. "Big ticket" item leases, on the other hand, normally impose no residual value guarantee on the lessees. The need for such guarantees is reduced, if not eliminated, by the fact that such leases typically are for a term which approximates the economic life of the properties. Leases in which there is a residual value guarantee are designated, in the language of commerce, as "open end" leases, while those in which no such guarantee exists are designated "closed end" leases.

Closed end leases, therefore, do impose on the lessor bank a risk not borne in the case of open end leases. In the former the lessor bank must absorb any difference between the estimated residual value at the end of the lease and a lesser actual resale price. In the open end lease, on the other hand, any such difference is guaranteed by the lessee. It is this distinction between the two types of lease that, as already noted, strongly influenced the trial court's disposition of this case.

Notwithstanding this difference between open end and closed end leases, the lessor bank under each type of lease realizes on the property at the expiration of the lease in a substantially similar manner. Thus, at the lease's end the lessor bank will dispose of the property in the simplest possible manner. Should the lessee not purchase the item, either for the estimated residual value or for a mutually agreeable price, the lessor bank will dispose of it by sale or by way of a new lease. Motor vehicles not sold to the lessee, for example, are either resold to the dealer, sold in the wholesale market, or leased to another customer. Moreover, the record of this case does not reveal that closed end leases as a class impose significantly more onerous economic burdens on banks than do open end leases. This is not surprising because leases of "big ticket" items, leased under closed end terms, generally provide for the bank's investment plus interest to be returned by way of lease payments prior to the expiration of the lease.

From the standpoint of a bank the advantages of leasing, as opposed to traditional lending on chattel security, are said to be numerous. Certain tax benefits pertaining to depreciation and the investment tax credit are said to be available under leasing but not under lending. Leasing, it is pointed out in the record of this case, permits the avoidance of usury laws and increases the demand for credit by eliminating the need for down payments by the customer.

Lessees also may derive advantages from leasing not available when conventional borrowing is employed. A lease obligation may be reflected on the balance sheet more favorably than an indebtedness, and leasing may permit avoidance of limitations on the lessee's ability to borrow. *See Stiles & Walker, Leveraged Lease Financing of Capital Equipment*, 28 Bus. Lawyer 161 (1972).

In any event, leasing yields to the banks a rate of return that compares favorably to that of lending. A portfolio of prudently-arranged leases imposes no greater risks than one of equally prudently-arranged

loans. It is small wonder, therefore, that today over 1000 national banks are engaged in the leasing of personal property which has an aggregate value in excess of $2 billion.[3] Thus, although much of this growth has occurred in the 1970's and resulted from the entrance of national banks into the field of motor vehicle leasing, it is clear that leasing at present is a significant part of the business of national banks.

## II.

### The "Business of Banking."

■ While the importance of leasing to the business of national banks is relevant to determining the extent to which such activity is useful and convenient, it does not alone establish that leasing is within the "business of banking" as authorized by 12 U.S.C. § 24 (Seventh). In construing the scope of the authority established by this statutory provision, we adopt the approach employed by the First Circuit in *Arnold Tours, Inc. v. Camp*, 472 F.2d 427, 431–32 (1st Cir. 1972). That is, for an activity to be pursuant to an incidental power "necessary to carry on the business of banking" it must be "convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers under the National Bank Act." *Id.* at 432. Thus, leasing must be convenient or useful to business *expressly* authorized by 12 U.S.C. § 24 (Seventh). As indicated above, we hold that leasing, when in the light of all relevant circumstances the transaction constitutes a loan of money secured by the leased property, see p. 1379, is incidental to the "loan of money on personal security," an activity expressly authorized by the National Bank Act.

In reaching this conclusion we draw comfort from the fact that commentators uniformly have recognized that the National Bank Act did not freeze the practices of national banks in their nineteenth century forms. Indeed, many contend that the powers of national banks "are not confined to the powers specified in the National Bank Act and those necessary to carry out those specific powers." Trimble, *The Implied Power of National Banks to Issue Letters of Credit and Accept Bills*, 58 Yale L.J. 713, 721 (1949). *See* Huck, *What Is the Banking Business?* 21 Bus. Lawyer 537, 541 (1966); Note, *Diversification by National Banks*, 21 Stan.L.Rev. 650, 651–53 (1969). We prefer, however, the *Arnold Tours, Inc.* formulation of the scope of "incidental" powers; but, whatever the scope of such powers may be, we believe the powers of national banks must be construed so as to permit the use of new ways of conducting the very old business of banking. Those who would reject such new ways should recall that Chief Justice Holt's efforts in *Clerke v. Martin*, 2 Ld.Raym. 757 (1702) to deny the negotiability of promissory notes payable to a named payee or order was overturned by statute several years later. 3, 4 Anne c. 9 (1704). As Holdsworth put it, Chief Justice Holt's mistake was to believe that "the most correct technical reasoning could stop the development of the new machinery rendered necessary by the new needs of an expanding trade." Holdsworth, *History of the English Law VIII, 175–76* (1926). Unless compelled by higher authority, which we would then believe to be misguided, we do not wish in the context of this case to repeat Chief Justice Holt's mistake.

Appellants would have us follow in Holt's footsteps by emphasizing that secured lending to permit the acquisition of property can be accomplished through traditional forms. A loan secured by a chattel mortgage or a conditional sales contract provides the proper means, they insist, by which a "loan of money on personal security" ought to be accomplished. A lease which serves the same purpose is impermissible. Particularly is this true, they assert, when both the lessor bank and the lessee customer distinguish the lease from a loan, and third parties, including various government agencies, treat the two quite differently.

---

**3.** These figures appear in the appellee banks' brief p. 46 and are derived from a survey introduced at the trial made by the Comptroller of Currency.

Appellants are correct in stating that functionally interchangeable leases and secured loans are regarded as distinct in both the rhetoric and regulation of this form of commerce. However, it is their functional interchangeability that is the touchstone of our decision. To ignore that in the interpretation of 12 U.S.C. § 24 (Seventh), is figuratively to reject, as did Chief Justice Holt, something "invented in Lombard Street." *Clerke v. Martin, supra.* Whether third parties in other contexts should treat leases that are equivalent to loans as nonetheless distinct and separate is not at present before us. Whatever might be the proper dispositions of such issues, they should not influence our opinion in this case.

## III.

*The Limits of the "Business of Banking."*

It should be clear that our holding is not without limits. It does not embrace the view that national banks may compete with appellants in the daily or short-term car rental business. Nor does it permit national banks to become self-financing automobile dealers, utilizing their unique position to acquire an inventory of automobiles at advantageous prices to lease at going market rates to customers. Neither activity is a means by which a bank makes a "loan of money on personal security." Each is a business distinct from banking.

■ A national bank also leaves the business of banking when it undertakes, as a "service" to its customers, to pass on to them any price reductions which its marketing power can extract from sellers of auto-

mobiles or other personal property. There may be a place for a "buyer's cooperative" in automobile marketing, but that place is not in a national bank. Such a cooperative, whether in substance or in form, is not the business of banking.

■ It is also clear that national banks cannot provide operational services such as repairs, maintenance, spare parts, insurance coverage, license renewals, etc. Such services are not those of a bank.[4] This proscription shapes the duration of a lease that a national bank properly can employ. Short term leases which inescapably thrust upon the bank significant service responsibilities impose non-banking responsibilities. As previously indicated, leases of automobiles for two or three years do not necessarily entail nonbanking responsibilities;[5] and, of course, a lease for the economic life of the property also does not.

Proscribed operational services, also, do not include the functions incident to the disposal of the property at the expiration of the lease as described at p. 1381 of this opinion. So long as these activities constitute only the orderly liquidation of the bank's security they remain within the business of banking.

■ Finally, our holding manifestly is not intended to authorize leases which impose significant financial risks on national banks more onerous than those incident to loans. Therefore, it is necessary that the lessor bank look primarily to the obligations of the lessee for the entire return of its advances. It is the lessee's credit worthiness, not primarily the market value of the leased property, to which the bank must

---

**4.** See, *Automobile Leasing as an Activity for Bank Holding Companies*, Fed. Reserve Bull., Nov. 1976, 930, 935.

**5.** In describing leases which are equivalent to secured loans, it has been said:

In each case there is a sum certain in amount. This sum includes the acquisition cost of the vehicle and the cost of financing and is recovered through a series of noncancellable deferred payments. The term of the payment period in both cases is 24 to 36, or recently to 48 months. The vehicle serves as a type of collateral to guarantee payment on

both the installment loan and the lease. Both forms of financing are applied to a specific automobile that is chosen prior to preparation of the document . . . .. All attributes of ownership pass to the lessee who is responsible for servicing, insurance, and depreciation.

[The banks] use the same skills in leasing a vehicle as they do in financing it through an installment loan.

*Automobile Leasing as an Activity for Bank Holding Companies, supra* n. 4.

look for its return. No banker, however, ignores the borrower's collateral; nor must he when the loan is cast in lease form. Our point, put differently, is that a lease, which from its inception inevitably must be repeated or extended to enable the bank to recover its advances plus profit, is not a "loan of money on personal security." Such leases indicate a rental business, not the business of banking. To engage in the business of renting personal property would permit the assumption of risks not permitted national banks. An impermissible assumption of risks is not indicated, however, either by an open end lease, in which the bank's entire advance is guaranteed by the lessee, or a closed end lease, in which the residual value of the leased property at the expiration of the lease contributes insubstantially to the bank's recovery of its advances plus interest.

### IV.

#### Role of the Comptrollers.

We recognize our observations do not provide a comprehensive charter by which the appellee banks may guide their steps. For example, we have not dealt with the type of advertising that is compatible with leasing activities of national banks that are within their statutory authority. Nor do we comment on the appropriateness of a subsidiary of a national bank acquiring a dealer's license from the state and maintaining a garage for storing previously leased automobiles.

Preparation of a comprehensive charter is a function that belongs to the Comptroller. It is his duty to promulgate reasonably detailed regulations which will confine leasing within the channels of the "business of banking." We do not believe that 12 C.F.R. §§ 7.3400 and 7.7376 adequately perform this duty.

Our present contribution merely sketches the boundaries of the business of banking and resolves the particular controversy before us.

We affirm in part and reverse in part and remand for such modifications of the trial court's judgment as is required by this opinion.

Costs shall be borne by the appellants.

Affirmed in part, Reversed in part.

KOELSCH, Circuit Judge, concurring in part, dissenting in part:

I concur in much of Judge Sneed's able effort to introduce a degree of coherence into the rapidly developing (and judicially uncharted) field of bank "lease financing." Shorn of the "language of commerce," I understand the majority to sanction two forms of lease transactions that may permissibly be engaged in by national banks under section 24 (Seventh) of the National Bank Act (12 U.S.C. § 24 (Seventh)): either the bank as lessor recovers all of its investment and profit in the form of rental payments from the lessee over a lease term spanning the substantial economic life of the chattel, or at the expiration of a lease term less than that of the approximate economic life of the asset, looks to the lessee to guarantee any "residual value," that is, the bank's investment and profit less the sum of rentals collected over the term of the lease. (Parenthetically, I read the majority opinion as invalidating short-term lease transactions which make no provision for the lessee's guarantee of the chattel's residual value—the so-called "closed-end lease" —except where "the residual value of the leased property at the expiration of the lease contributes insubstantially to the bank's recovery of its advances plus interest." (Majority opinion at 1384, my emphasis.))

The majority approves the former transaction (typically employed, in banker's jargon, in the financing of so-called "big ticket" items) because the lessor-bank, having recovered its investment over the term of the lease, assumes no risk not incidental to one aspect of the "business of banking": the "loaning of money on personal property" (12 U.S.C. § 24 (Seventh)), albeit cast in the form of a lease. Accordingly, I concur in that part of the majority opinion holding that such transactions constitute the "business of banking" within the meaning of the statute. The bank recovers its advances

plus interest in the form of rentals over the term of the lease, and the record indicates that as a matter of practice in such arrangements, the bank bears no risk of having to recover its investment by regaining possession of the chattel for the purpose of further realizing on its security.[1] I agree with the majority that such transactions are functionally indistinguishable from purchase money loans secured by a lien-like interest in the chattel.

The majority upholds the use of short-term leases, however—typically employed in the "financing" of motor vehicles and like consumer items—on the ground that in such transactions the bank looks to the credit-worthiness of the lessee to guarantee the anticipated resale value of personal property leased for a term less than that of its approximate economic life, thus freeing the bank of any obligation to realize further on the chattel by repeated leasings or comparable means of recovering its investment. The majority appears to reach this result by analogizing the bank's recovery and disposition of the chattel at the expiration of the lease to "the orderly liquidation of the bank's security . . . ." (Majority opinion at 1383.)

I agree, of course, with the proposition that a "lessor"-national bank may properly engage in functions incident to the orderly liquidation of its security. That is a traditional incident of the "business of banking" necessitated when any borrower defaults on a loan. But I do not regard that rule as in any way relevant to the present inquiry. In my view, the short-term lease arrangement entered into between the bank and the lessee contemplates at the outset that the bank will inevitably gain or regain possession of the subject matter of the so-called lease and that the amount reserved

as rent does not reflect the full value (or price) of the chattel plus interest. In such cases, the transaction is not, in my view, to be deemed one which constitutes the "business of banking" within the meaning of the statute. For in every such instance the fact is manifest that the bank itself will ultimately become the owner of the chattel.

In such a short-term lease transaction, it matters not whether the bank secures the guarantee of the lessee as to the residual value of the chattel at the expiration of the lease or must itself bear the risk of a downward fluctuation in value. On whomever the risk of a downward market falls, the bank as lessor must—if the lessee himself does not agree to purchase the property[2] —look to the market in the first instance in order to realize the full value of its investment. The majority concedes as much (at 1381) in noting that "[s]hould the lessee not purchase the item . . . the lessor bank will dispose of it by sale or by way of a new lease." The bank is thus drawn ineluctably into the business of disposing of used chattels—not in pursuit of the lender's traditional remedy of foreclosure and sale incident to the borrower's default—but pursuant to the terms of the lease agreement itself. In my view, the resultant preordained participation of national banks in the market disposition of personal property is neither a part of the "business of banking" nor an incident thereto. I accordingly dissent from that part of the majority opinion holding short-term lease financing by national banks to be within the purview of 12 U.S.C. § 24 (Seventh).

1. Except, of course, in those distinguishable instances where the "lessee" defaults on its rental obligation under the terms of the lease agreement. *See* the discussion in the text, *infra* at p. 1385.

2. As the record in this case indicates, among the advantages offered the consumer by the motor vehicle lease transaction—as advertised by the defendant banks—are driving "top-of-the-line" new cars, no trade-in problems and

few repairs. Such advantages would seem to accrue only where the consumer contemplates a relatively short term (24 to 36 month) use of the vehicle and suggest that, realistically, the parties to the transaction envision from the outset that the bank will itself dispose of the vehicle at the expiration of the lease by either offering it to the franchise dealer who generated the lease or wholesaling it to another dealer for resale.