SWIFT DODGE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3288–79.     Filed April 6, 1981.

*Thomas E. Smail, Jr.,* for the petitioner.
*Robert W. Towler,* for the respondent.

SCOTT, *Judge*: Respondent determined deficiencies in petitioner's income taxes for taxable years 1974 and 1975 in the amounts of $25,922.84 and $22,168.37, respectively.

The issue for decision is whether in calendar years 1974 and 1975 petitioner is entitled to a section 38, I.R.C. 1954,[1] investment credit with respect to vehicles acquired by petitioner for use by other persons pursuant to the terms of an agreement entitled "Lease Agreement."

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Swift Dodge (petitioner), a California corporation, had its principal place of business in Sacramento, Calif., at the time of

---

[1]All statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the years here in issue, unless otherwise stated.

filing its petition in this case. Petitioner filed its Federal corporate income tax returns for the calendar years 1974 and 1975 with the Internal Revenue Service Center, Fresno, Calif.

Throughout 1974 and 1975, Swift Dodge was engaged in the automobile dealership business. Petitioner also engaged in this business in the years prior and subsequent to the years here in issue.

Swift Leasing Co. operated as a separate corporate entity during its fiscal year September 1, 1972, through August 24, 1973. Throughout this year, Swift Leasing Co. purchased various vehicles for subsequent use by third parties. Swift Leasing Co. required each third-party user to enter into an agreement entitled "Lease Agreement" prior to his receipt of the vehicle.

During its fiscal year ending August 24, 1973, Swift Leasing Co. was merged into Swift Dodge, and the transfer of its assets to Swift Dodge was completed by August 24, 1973. After the merger, petitioner corporation included sales and leasing divisions, the latter of which petitioner referred to by the name of "Swift Leasing Company." The Swift Leasing Co. operations were substantially smaller than petitioner's sales division. Both prior and subsequent to the merger, the Swift Leasing Co. activities were physically located in a building apart from the Swift Dodge sales business. In the years in issue, petitioner maintained separate bookkeeping and computer operations for each division. Accordingly, the salaries of the personnel working in the sales and Swift Leasing Co. divisions in part were based upon the profit generated by the particular department with which the employee was affiliated.

In 1974 and 1975, on behalf of its division referred to as "Swift Leasing Company," Swift Dodge purchased vehicles for use by other parties. As had been the practice when Swift Leasing Co. was a separate corporation, customarily the prospective vehicle user indicated to petitioner the specific Chrysler or non-Chrysler vehicle desired and applied to petitioner to arrange for both the execution of a "Lease Agreement" and the use of the vehicle. If the person selected a Chrysler motor vehicle, petitioner determined whether the particular vehicle was in its present inventory, which was the same inventory as that from which petitioner sold vehicles to the general public. When the Chrysler vehicle was not part of petitioner's existing inventory, petitioner purchased the vehicle from another dealer. On the other hand, if

a person desired a vehicle manufactured by a corporation other than Chrysler Corp., petitioner purchased the vehicle from an appropriate non-Chrysler dealer.

To obtain moneys with which to purchase the vehicles from Chrysler Corp. and other dealers, petitioner borrowed funds from the Bank of America National Trust & Savings Association (Bank of America) and the United California Bank. Often petitioner borrowed money equal in amount to the purchase price of the vehicle; however, the amount borrowed at any one time depended upon petitioner's general operating capital requirements.[2]

On September 24, 1971, the Bank of America and Charles O. Swift, signing on behalf of Swift Leasing Co., entered into a "Leasing Company Agreement." This "Leasing Company Agreement" set forth the conditions under which the Bank of America would lend moneys to Swift Leasing Co.[3] Pursuant to the

---

[2] An examination of the promissory notes executed in favor of the banks which were attached to each "Lease Agreement" reveals that, in the majority of instances, the borrowed funds were only several hundred dollars less than the "Capitalized Cost" stated in the particular "Lease Agreement." For a definition of "Capitalized Cost," see pages 556–557 *infra*.

[3] It appears from the record that the 1971 loan and security agreements between Swift Leasing Co. and the Bank of America remained in effect during calendar years 1974 and 1975. We conclude from the record that petitioner continued to borrow funds for vehicle purchases from the Bank of America under the 1971 agreement between the bank and Swift Leasing Co.

The Sept. 24, 1971, "Leasing Company Agreement" executed between the Bank of America and Charles O. Swift, on behalf of Swift Leasing Co., provides in part:

"1. This agreement between the undersigned Lessor of motor vehicles, hereinafter called Lessor, and Bank of America National Trust and Savings Association, hereinafter called Bank, covers the arrangements under which Bank will lend monies to Lessor against leased motor vehicles. Said advances will be under lines of credit as may be established by Bank from time to time.

"2. As security for the line of credit, Lessor will execute and deliver to Bank a Security Agreement and Assignment of Rentals in form satisfactory to Bank which shall cover all motor vehicles for which Bank thereafter advances monies to Lessor.

"3. At the time Lessor enters into a lease with Lessee covering a new motor vehicle or vehicles, Lessor will deliver to Bank the following:

"a. A promissory note, in principal amount and calling for monthly payments, maturity, and rates of interest as are agreed upon under the line of credit.

"b. A Security Agreement Supplement which shall identify motor vehicles subject to the Security Agreement and Assignment of Rentals.

"c. A copy of the applicable executed motor vehicles lease and related supplement(s) thereto, if any, in form satisfactory to Bank.

"d. Evidence of insurance covering leased vehicle(s) against the risks of fire, theft, and collision and public liability and property damage insurance satisfactory to the Bank.

"e. Satisfactory evidence of the purchase price of the leased vehicle(s) by Lessor.

"4. Lessor agrees that each leased motor vehicle hereunder will be registered in the name of Lessor with Bank named as legal owner or lienholder."

"Leasing Company Agreement" the bank promised to advance funds to Swift Leasing Co. under lines of credit if Swift Leasing Co. granted the bank a security interest in those motor vehicles subsequently purchased with the loaned funds. Swift Leasing Co. tendered the required security interest to the Bank of America pursuant to a "Security Agreement and Assignment of Rentals" executed on November 30, 1971, by Charles O. Swift, president, on behalf of Swift Leasing Co., debtor.[4] Included in

---

\*     \*     \*     \*     \*     \*     \*

"7. Lessor will pay all monies due Bank under promissory notes promptly when due. In the event that Lessor fails to pay any monies promptly when due to Bank or if in the opinion of Bank Lessor is insolvent, or if Lessor violates any of the terms of this agreement, Bank may elect to collect any or all lease rental payments direct from any or all Lessees as provided in the Security Agreement and Assignment of Rentals executed in favor of Bank by Lessor."

[4]In pertinent part, the "Security Agreement and Assignment of Rentals" executed Nov. 30, 1971, provides:

"This Security Agreement is between the undersigned, SWIFT LEASING COMPANY (A CORPORATION), as Debtor, and BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, as Secured Party.

"Debtor does hereby grant a security interest in all of the motor vehicles listed and described on Supplement 1 to this Security Agreement, attached hereto and made a part hereof for all purposes, together with such other motor vehicles as may be made subject to this Security Agreement by subsequent Supplements executed by Debtor; all said vehicles being hereinafter called the collateral.

"1. This Security Agreement secures the payment in lawful money of the United States of America to Secured Party, of the following:

"(a) Promissory notes of various dates herewith and hereafter executed by Debtor, payable to Secured Party and bearing a notation that they are secured by this Security Agreement.

"(b) All sums that may be advanced and expenditures that may be made by Secured Party to or on behalf of Debtor * * * "

\*     \*     \*     \*     \*     \*     \*

"2. Debtor warrants that Debtor is the absolute owner of all collateral hereinabove described and that the collateral is free and clear of and will be kept free and clear of all liens, levies, encumbrances and adverse claims of any kind or character; provided, however, that Debtor may lease the same, and as additional security for the payment of all sums hereinabove provided for to be secured by this Security Agreement, Debtor assigns, transfers, and sets over to Secured Party all rentals under any such lease or leases; and provided further, however, that Debtor may collect and retain said rentals, which right terminates automatically upon any default by Debtor of any provision of this Security Agreement, or upon notice by Secured Party to Debtor that Secured Party desires to collect such rentals."

\*     \*     \*     \*     \*     \*     \*

"5. If default is made in the prompt payment when due of any sum secured hereby, or if Debtor default [sic] in the performance of any covenant contained in this Security Agreement or breaches any warranty made in this Security Agreement * * * or if Debtor make [sic] an assignment for the benefit of creditors, Secured Party at its option may declare all sums secured hereby immediately due and payable without demand or notice and may, at its option, enter upon the premises where the collateral may be and take possession thereof; and take such measures as Secured Party may deem necessary or proper for the care or protection thereof and remove and sell the collateral at either public or private sale, with or without notice, with or without presence of the collateral at time and place of sale. * * * "

the provisions of the "Security Agreement and Assignment of Rentals," was a warranty to the Bank of America that Swift Leasing Co. was the—

absolute owner of all collateral [the listed motor vehicles] * * * and that the collateral is free and clear of and will be kept free and clear of all liens, levies, encumbrances and adverse claims of any kind or character; provided, however, that Debtor may lease the same, and as additional security * * * Debtor assigns, transfers, and sets over to Secured Party all rentals under any such lease or leases. [5]

Pursuant to both the "Leasing Company Agreement" and the "Security Agreement and Assignment of Rentals," each time Swift Leasing Co. and a vehicle user executed a "Lease Agreement," petitioner assigned the "Lease Agreement" to the lending institution as security and signed a promissory note with duration of approximately the same length as the particular "Lease Agreement."[6]

In its fiscal year ending August 24, 1973, Swift Leasing Co. entered into 210 "Lease Agreements," of which 148 are in dispute.[7] In 1974, petitioner executed with various third parties 137 "Lease Agreements," of which 105 are in dispute, and in 1975 petitioner entered into 159 such agreements, of which 130 are in dispute. In the years in issue, the "Lease Agreements" generally were written for terms of 36 months.[8] None of the

---

[5]Several loans were obtained from the United California Bank. A similar security agreement was attached to each of the "Lease Agreements" which covered vehicles for which petitioner borrowed acquisition funds from the United California Bank. Among the provisions specified in those security agreements were the following: petitioner warranted that it was the sole owner of the vehicle; no encumbrances, adverse claims, liens, and security interests existed on the vehicle; the license and ownership certificate would indicate the United California Bank as the legal owner; petitioner would maintain fire, theft, and collision insurance and would name the bank as the primary payee; in event of default by petitioner, the balance of the monthly payments due could be accelerated; and if the vehicle substantially decreased in value, the bank could demand further security from petitioner.

[6]Most of the "Lease Agreements" in the years in issue were for terms of 36 months; the majority of the promissory notes were for 35 months.

[7]The leases entered into by Swift Leasing Co. in its fiscal year ending Aug. 24, 1973, are involved in this case because petitioner claimed a carryover in investment credit from Swift Leasing Co.'s fiscal year ending in 1973. Respondent did not question petitioner's right to a carryover of any investment credit to which Swift Leasing Co. was entitled in that year but argues that Swift Leasing Co. was not entitled to such investment credit.

[8]There were some leases for shorter periods, but most of those shorter leases, in addition to leases that terminated with petitioner's sale of the vehicle causing recapture of the investment credit, are not in dispute in this case.

agreements restricted the vehicles for use in a trade or business or for the production of income.

Chrysler Corp. distributed throughout the United States and Canada the "Lease Agreement" form utilized by Swift Leasing Co. in its fiscal year ending August 24, 1973, and by petitioner in the calendar years 1974 and 1975. Substantially all of these agreements contained identical boilerplate provisions. All except three of the disputed "Lease Agreements" contained an "open end" notation on the upper right corner of the first page.

The text of the "Lease Agreements" executed in the years in issue included information on the vehicle involved; the amount and terms of payment; the party responsible for maintenance, repairs, insurance, taxes, licensing, and registration; a statement of the places for delivery of the vehicle and of its return upon premature termination, regular termination, or any extension thereof; a premature termination provision; clauses regarding the use of the vehicles, indemnity, damage responsibilities, default, attorneys' fees-costs-waiver; and miscellaneous other provisions. In relevant part, the "Lease Agreements" specified the following:

LEASE AGREEMENT

\*     \*     \*     \*     \*     \*     \*

THE PARTIES HEREBY MUTUALLY AGREE AS FOLLOWS:

\*     \*     \*     \*     \*     \*     \*

2. RENTAL PAYMENT AND TERM: Lessee agrees to accept the above vehicle at the rental rate specified. The term "vehicle" when used in this agreement shall mean motor vehicle leased hereunder by Lessee.

\*     \*     \*     \*     \*     \*     \*

This agreement is one of leasing only and the Lessee shall not have or acquire any right, title, or interest in the vehicle except the right to use or operate it as provided herein.

| Monthly Rent | Insurance | Maintenance | License | Sales Tax | Total Payment |
|---|---|---|---|---|---|
| $_____ | $_____ | $_____ | $_____ | $_____ | $____ per mo. |

| Term of Lease | Depreciation Reserve | Security Deposit | Delivery Date | Billing Date |
|---|---|---|---|---|
| ____ Months | $____ per month | $____ | _____ | ____ |

(Line 1.) Capitalized Cost. Value of Motor Vehicle     $ _____

(Line 2.) Total amount of periodic payments to be credited to Lessee in establishment of any liability at end of lease period: (months × $\_\_monthly Depreciation Reserve     $ _____

(Line 3.) The total amount of periodic payments not so credited (months × $\_\_     $ _____

(Line 4.) The maximum for which Lessee could be liable at the end of lease period (Line 1.) minus (Line 2.) (Depreciated Value) $ _____

(Line 5.) Amount, if any, for insurance, if such insurance is provided by or procured thru Lessor     $ _____

      *      *      *      *      *      *      *

IF NO CHARGE IS MADE FOR INSURANCE, NONE IS PROVIDED BY LESSOR

      *      *      *      *      *      *      *

3. MAINTENANCE AND REPAIRS: Lessee shall keep and maintain each vehicle in good operating condition and working order, using as a guide the maintenance program prescribed in Owner's Manual, and shall perform all preventative maintenance required to insure full validation of the manufacturers warranty.

      *      *      *      *      *      *      *

Lessor will provide maintenance if so specified under the provisions of the lease, and except for such costs, Lessee will pay for all other maintenance not covered by the manufacturer's warranty.

4. INSURANCE: Insurance shall be procured for each vehicle and shall be maintained during the term of the lease as provided under the provisions of the lease, with companies satisfactory to Lessor. * * *

If Lessee provides insurance, such insurance shall be endorsed to provide that Insurer will notify Lessor immediately in the event the insurance should be materially altered or cancelled, and Lessor may (but shall not be obligated to) secure necessary insurance protection at Lessee's expense.

      *      *      *      *      *      *      *

All insurance policies covering the vehicle shall be endorsed to protect as their interest may appear, Lessee, Lessor and any other person having an interest in the vehicle.

5. TAXES, LICENSING, REGISTRATION: The cost of all licensing, registration of the vehicle in Lessor's name and such taxes as are specified shall be paid for by Lessee, and Lessee shall pay all other taxes and/or government assessments, fees and charges imposed on or in connection with any vehicle operated pursuant to this Agreement. Lessee shall pay and bear all net income taxes on rent payable hereunder.

      *      *      *      *      *      *      *

a. 7. PREMATURE TERMINATION: Lessee may terminate this lease with

respect to this vehicle at any time after twelve (12) months from the date of delivery of the same, and prior to the end of the lease term, by giving Lessor thirty (30) days notice in writing, provided that Lessee shall bear any loss or receive any gain which results from final disposition of the vehicle. When a vehicle is returned to Lessor upon such termination, Lessor shall promptly obtain the highest available cash offer at wholesale for the vehicle and notify Lessee in writing of the offer indicating the gain or loss pursuant to this paragraph, which would result from acceptance of such offer. Lessee will notify Lessor within (5) business days thereafter that it will accept such gain (or bear such loss as the case may be) or will otherwise arrange for the immediate sale of the vehicle in order to obtain the Termination Value thereof for the Lessor. If Lessee fails to make any election within five (5) business days of receipt of such notice, Lessor is authorized to accept such offer and credit or debit Lessee as appropriate. All payments due Lessor as a result of any termination shall be due as soon as the amount of the payment is ascertained.

b. The gain or loss on any final disposition shall be the difference between the offer received and the Capitalized Cost of the vehicle, less the monthly reserve accumulated at the time of termination aforesaid.

c. Any termination hereof shall not release Lessee from Lessee's obligation to pay all money then due hereunder to Lessor.

d. The term "Termination Value" as used herein shall mean the Capitalized Value, less the monthly Reserve accumulated at the time of termination aforesaid, plus any rental payments due, pro rata share of any license or tax which now is or which may hereafter be imposed upon Lessor or upon Lessee for the renting and use of said car hereunder, and the unamortized portion of any annual prepaid license fees and applicable taxes paid by Lessor.

e. If any vehicle is lost or stolen or so damaged that it cannot, in Lessor's judgment be economically repaired, the lease with respect to such vehicle shall terminate effective thirty (30) days from the date of notice by Lessee to Lessor of the loss, theft or damage. Lessee shall pay Lessor the Termination Value of such vehicle computed as provided in sub-paragraphs (b)(c) and (d) above, on the effective date of termination, less the proceeds from any insurance settlement paid the Lessor.

       \*       \*       \*       \*       \*       \*       \*

9. INDEMNITY: Lessee shall defend, indemnify and hold harmless Lessor and the officers and employees of Lessor, from and against any damage, loss, theft, or destruction of any vehicle, and against all losses, liabilities, damages, injuries, claims, demands, costs and expenses of every kind and nature whether or not covered by insurance, including legal fees and disbursements, arising out of and in connection with the use, condition or operation of vehicles during the lease term.

       \*       \*       \*       \*       \*       \*       \*

11. DEFAULT: Time is of the essence of this Agreement and in the event that Lessee fails to pay in full on the date due any rental payment due hereunder, or defaults in the performance of any of the other terms, conditions and covenants contained herein, or in the event of Lessee's bankruptcy or insolvency, or if the leased vehicles be levied upon or encumbered in any way, or if at any time, in the exclusive judgment of Lessor, his rights in the leased

vehicles in any way shall be prejudiced or rendered insecure, Lessor shall have the right to take immediate possession of the vehicles wherever found, with or without process of law, and to terminate the lease with the respect to such vehicles, and Lessee expressly authorizes Lessor and its agents to enter on any premises where the vehicle may be found for the purpose of repossessing such vehicles, and expressly waives any further interest in the vehicles and any right of action arising out of such entry and repossession. Lessor shall not be liable in damages for any termination pursuant to this paragraph. Lessee shall, however, upon termination pursuant to this paragraph be immediately responsible for the payment of all amounts due under the lease agreement through the date of termination, for the loss, (if any), resulting from the sale of the vehicle pursuant to the provisions of paragraph 7 hereof entitled "Premature Termination", (with the gain, if any, to be applied by Lessor to the payment of amounts due under this paragraph), for liquidated damages of One Hundred Dollars to compensate Lessor for the inconvenience and expense of the default termination, and in addition to the above for any specific damages Lessor may have sustained as a result of Lessee's default including, but not limited to, out of pocket costs of repossession and reasonable attorney's fees. If Lessee fails to accept delivery of any vehicle ordered hereunder, Lessor may retain any security deposit as liquidated damages.

*     *     *     *     *     *     *

13. GENERAL AND MISCELLANEOUS: This instrument constitutes the entire Agreement between the parties hereto and shall be binding on their heirs, executors, administrators and their legal representative, successors and assigns. * * *

Neither this Agreement nor any interest herein may be assigned by Lessee without the prior consent of Lessor thereto in writing. This lease or its interest or any rent due or to become due may, however, be assigned by Lessor without consent of Lessee, but subject to the rights of Lessee hereunder.

*     *     *     *     *     *     *

14. PROVISIONS OF THE LEASE

## LICENSE AND TAXES

| Provided by Lessor | | Provided by Lessee |
|---|---|---|
| — | State License | — |
| — | Sales Tax | — |
| — | State Excise Tax | — |
| — | Personal Property Tax | — |
| — | All other Taxes | — |

## INSURANCE

| Provided by Lessor | | | Provided by Lessee |
|---|---|---|---|
| — | Fire, Theft and Comprehensive | $ ____Monthly | — |
| — | Collision ($100.00 deductable) | $ ____Monthly | — |
| — | Public Liability $100,000/300,000 | $ ____Monthly | — |

— Property Damage $25,000          $ ___Monthly          —
— First ($100.00 of any collision damage)
If insurance secured by Lessee, agent is: _____ Tel: _____
Date verified _____ Time _____ Verified by _____

---

### MAINTENANCE

| Provided by Lessor | | Provided by Lessee |
|---|---|---|
| | Mechanical Maintenance | |
| — | Repairs | — |
| — | Lubrication and Filter Changes | — |
| — | Oil Changes | — |
| — | Anti Freeze | — |

It is hereby agreed that maintenance will be provided as specified above by Lessor and/or Lessee. In event Lessor provides maintenance, Lessor agrees to return to Lessee any unused portion of the accumulated maintenance reserve credit, and Lessee agrees to pay to Lessor any maintenance costs in excess of the accumulated reserve credit on termination of this Lease. MONTHLY MAINTENANCE RESERVE CREDIT $ ___ Normal maintenance repairs to be performed PER MANUFACTURER'S WARRANTY.

\*     \*     \*     \*     \*     \*     \*

I acknowledge that this lease has been drawn with great consideration for anticipated values and I am fully aware there is a possibility of either a refund of rental or additional rental due at time of termination. I am further aware that used car values are determined by condition, mileage, remaining factory warranty and current market value at time of termination. I estimate my annual mileage to be ___ miles per year.

[signature of user]

Section 2 of each "Lease Agreement" specified the monetary terms of the agreement between the user and Swift Leasing Co. Although some of the terminology is self-explanatory, the meanings of lines 1 through 5 are not apparent. Line 1, the "Capitalized Cost" figure, included the amount Swift Leasing Co. paid to acquire the vehicle from the inventory of Swift Dodge or from another dealer plus an amount of profit. The "Capitalized Cost" also often included sales and lease commissions paid. The amount of profit included varies from lease to lease. Line 2 indicated for the agreement period the portion of the user's monthly payment considered necessary to establish a "Depreciation Reserve" based on the "Capitalized Cost" of the vehicle which, as heretofore stated, included an element of profit. The line 3 amount consisted of the agreed monthly payment amount not credited to the line 2 "Depreciation Reserve." Line 3 included such items as the lessor's cost of money, overhead expenses, and profit. The amount of profit was negotiated individually with each vehicle user. Accordingly, the

profit amount included in both lines 2 and 3 varied. The line 4 "Depreciated Value" was the projected wholesale blue book value of the vehicle on the termination date of the "Lease Agreement." Petitioner determined this projected value by calculating the present value of a 3-year-old similar vehicle that existed on the agreement's execution date. This line 4 amount always equaled the capitalized cost figure of line 1 minus the depreciation reserve of line 2. The "Depreciated Value" represented the maximum amount for which the vehicle user would be liable to Swift Leasing Co. at the stated termination date of the "Lease Agreement." Upon the normal termination of a "Lease Agreement" and the return of the vehicle to petitioner, if the actual value of the vehicle exceeded the stated "Depreciated Value," the user sometimes received credit when he entered into a new deal. Petitioner never provided the user a cash refund on this balance. If the "Depreciated Value" equaled the actual value of the vehicle, the user could return the vehicle with no obligation to make any further payment. On the other hand, if the line-4 stated "Depreciated Value" exceeded the vehicle's actual value, the user was to return the vehicle and pay the difference in the two values. Pursuant to petitioner's unannounced business practices, the user could opt to retain the vehicle and pay the "Depreciated Value" to petitioner whether that value was more or less or equal to the actual value of the vehicle.

During the tax years in issue, approximately one-half of the "Lease Agreements" provided that the vehicle users give Swift Leasing Co. security deposits in amounts of between $100 and $150. One agreement specified a $1,000 security deposit. Forty-eight of the "Lease Agreements" required cash advances from the users in amounts ranging from $100 to $1,313. Ordinarily, petitioner required cash advances in such special circumstances as modification of a vehicle by the addition of special equipment.

During the years in issue, petitioner supplied the manufacturer's vehicle warranty to the vehicle user. All of the "Lease Agreements" executed in the years in issue which were available to this Court provided that the user was responsible for all operating and maintenance expenses, except those specifically stated as the responsibility of petitioner or covered by the manufacturer's warranty. None of the "Lease Agreements"

specified the operating and maintenance costs as the responsibility of petitioner.

Except in 31 instances, in 1975 the "Leased Agreements" placed the responsibility for payment of the vehicle sales tax on the customer. In that same year, in all cases except one, the user of the vehicle was responsible for payment of the State license fees.

During the years in issue, those "Lease Agreements" that required the vehicle user to maintain insurance, specified that the coverage include fire, theft, and comprehensive, collision ($100 deductible), public liability ($100,000/$300,000), and property damage ($25,000). In six instances, the agreement did not specify the party responsible for this insurance coverage.

Swift Leasing Co. and petitioner purchased bodily injury and property damage liability insurance to provide for those situations where a vehicle user may have failed to acquire or maintain the required insurance. The ceiling amount maintained for these contingent insurance policies were as follows: Bodily injury, each person—$300,000; bodily injury, each occurrence—$300,000; and property damage, each occurrence—$100,000. The premium for this contingent insurance approximated $1.20 per month per vehicle covered by the "Lease Agreements." The insurance premium was approximately 5 to 10 percent of a user's cost for primary insurance. Additionally, Swift Leasing Co. and petitioner maintained a blanket excess liability policy with limits of $2 million for each occurrence and $2 million in the aggregate. This policy supplemented the contingent and other insurance policies held by Swift Leasing Co. and petitioner. Effective October 1, 1975, petitioner also carried backup collision insurance to protect itself in the event that the user failed to maintain collision coverage.

Swift Leasing Co. maintained records on each vehicle covered by a "Lease Agreement" entered into during its fiscal year ending August 24, 1973, and petitioner maintained such records for the calendar years 1974 and 1975. These records indicated the "Lease Agreement" number; the user; the delivery date specified in the agreement; the period of the agreement; the stock number of the vehicle; the serial number of the vehicle; the insurance company that provided the user's insurance; the type of vehicle; whether at the termination of the agreement the vehicle was sold, or whether the agreement was extended for an

additional period of time; the person who paid the final payments required by the agreement; whether the vehicle was purchased by Swift Dodge and the new stock number; whether the vehicle was repossessed, and if so, the subsequent sales date and purchaser. A summary of this information is as follows:

*"Lease Agreements" Executed in Fiscal Year Ending 8/24/73*

All = 210

| | |
|---|---|
| 93 | paid off by the user |
| 28 | paid off by someone other than the user (including 4 paid off by someone other than the user pursuant to user's sale) |
| 81 | returned to petitioner and held in petitioner's inventory (includes 41 repossessions, 11 of which were voluntary) |
| 3 | agreement extended |
| 3 | "totaled" |
| 2 | information not available |

Disputed = 148

| | |
|---|---|
| 78 | paid off by the user |
| 24 | paid off by someone other than the user (including 3 paid off by someone other than the user pursuant to user's sale) |
| 44 | returned to petitioner and held in petitioner's inventory (includes 20 repossessions, 5 of which were voluntary) |
| 2 | "totaled" |

*"Lease Agreements" Executed in 1974*

All = 137

| | |
|---|---|
| 45 | paid off by the user |
| 17 | paid off by someone other than the user (including 3 paid off by someone other than the user pursuant to user's sale) |
| 73 | returned to and held in petitioner's inventory (includes 27 repossessions of which 16 were voluntary) |
| 1 | "totaled" |
| 1 | rewritten |

Disputed = 105

| | |
|---|---|
| 39 | paid off by the user |

  16  paid off by someone other than the user (includes 3 paid off by someone other than the user pursuant to user's sale)

  48  returned to petitioner and held in petitioner's inventory (includes 17 repossessions of which 9 were voluntary)

    1  "totaled"

    1  rewritten

*"Lease Agreements" Executed in 1975*

All = 159

  68  paid off by the user

  25  paid off by someone other than the user (includes 4 paid off by someone other than the user pursuant to sale by the user)

  61  returned to petitioner and held in petitioner's inventory (includes 19 repossessions, 15 of which were voluntary)

    4  still in effect

    1  information not available

Disputed = 130

  61  paid off by the user

  17  paid off by someone other than the user (includes 3 paid off by someone other than the user pursuant to sale by the user)

  48  returned to petitioner and held in petitioner's inventory (includes 7 repossessions, 3 of which were voluntary)

    4  still in effect

Of the 46 vehicles repossessed by petitioner during the calendar years 1974 and 1975, the balance due under the "Lease Agreements" totaled $187,818.91, the payments in arrears were $17,363.68, and repossession costs totaled $2,776.31, for a total deficiency of $207,958.90. The wholesale value of these repossessed vehicles was $164,806.13, which left petitioner with deficiencies totaling $43,152.77. Petitioner sold 24 of these repossessed vehicles at retail and realized a total profit above the wholesale value of $10,951.02, less total sales commissions of $3,602.12, which led to a net reduction of $7,348.90 in the deficiencies. Consequently, petitioner's net loss as a result of these repossessions was $35,803.87.

As an incentive to lease Chrysler vehicles, Chrysler Corp. paid cash to dealerships, including petitioner, for each Chrysler vehicle leased. Approximately 90 percent of petitioner's leased vehicles were Chrysler products. During the calendar years 1974 and 1975, petitioner received incentive payments from Chrysler Corp. of at least $20,895.

Petitioner's sales division included the sale of used and new vehicles. In its used car sales business, occasionally petitioner encountered a customer desirous of purchasing a particular used vehicle not in its used vehicle inventory. In that event, petitioner consulted its records to determine whether the vehicle could be found among those presently the subjects of "Lease Agreements" existing between petitioner and third parties. If the desired vehicle was so located, petitioner calculated whether it would be cost beneficial to terminate the "Lease Agreement" prior to the stated termination date. If the early termination proved cost beneficial, which would generally occur only within the latter part of the agreement's 36-month term,[9] petitioner would approach the vehicle's user to determine whether he would agree to an early termination and the substitution of a new agreement covering a different vehicle.

Often petitioner's customers purchased new vehicles pursuant to an admitted conditional sales contract. In such a case, petitioner and the buyer executed a document entitled "Security Agreement (Purchase Money) Motor Vehicle and Disclosure Required by Federal Law." This agreement listed the sales price, the sales tax, the downpayment, the amount financed, and the financing terms including the finance charge. It also specified such terms and conditions as the following: (1) The contract is a security agreement covering the motor vehicle, and title shall not pass to the purchaser until all amounts are fully paid; (2) a prepayment provision; (3) a provision indicating the seller's rights if purchaser defaults; and (4) the purchaser's obligations to maintain the vehicle free of liens and encumbrances and to provide insurance.

When petitioner sold a vehicle pursuant to an admitted

---

[9]During the first half of the "Lease Agreements" 36-month terms, petitioner ordinarily realized a negative cash flow with regard to each vehicle when the rental income received, which was attributable to a particular vehicle, was netted with petitioner's monthly principal and interest payments on that vehicle.

conditional sales contract, petitioner received the entire sales price at the time of the transaction. A portion of the sales price was paid by the purchaser in the form of a downpayment; the balance was paid to petitioner from the lending institution utilized by the purchaser. The purchaser paid the entire sales tax at the time of the sale.

Under the terms of a repurchase agreement, petitioner could become conditionally obligated to Bank of America or Chrysler Credit Corp. when the institution financed a vehicle sold by petitioner if the purchaser defaulted on his obligation. The repurchase agreement provided that where the lending institution repossessed a vehicle and returned it to petitioner within 90 days of the buyer's default, petitioner was financially responsible for the conditional sales contract terms. However, the Bank of America and Chrysler Credit Corp. instead could exercise an option to sell the vehicle. Where the Bank of America or Chrysler Credit Corp. failed to repossess and return the vehicle to petitioner within the 90-day period, petitioner was relieved of all further responsibility. Petitioner did not have any conditional responsibility with respect to conditional sales contracts financed by lending institutions other than the Bank of America and Chrysler Credit Corp.

On its Federal income tax returns for the calendar years 1974 and 1975, petitioner claimed investment tax credit with respect to the vehicles covered by the "Lease Agreements" as follows:

*1974 Income tax return*

Investment tax credit claimed on vehicles covered
by "Lease Agreements" executed in 1974 ............ $11,207

Carryover of investment credit claimed for vehicles
covered by "Lease Agreements" executed in Fiscal
Year Ending Aug. 24, 1973 ............................. $14,716

*1975 Income tax return*

Investment tax credit claimed on vehicles covered
by "Lease Agreements" executed in 1975................22,168

In his notice of deficiency, respondent disallowed the investment tax credit claimed by petitioner with the explanation that:

(c) Investment credit, including the carryover from 1973, on automobiles is disallowed in the following amounts because the property does not qualify for the investment credit under section 38 or 50 of the Internal Revenue Code. The

leases relating to the automobiles on which investment credit is being disallowed are determined to be conditional sales contracts.

|  | 1974 | 1975 |
|---|---|---|
| Cost of autos per return | $480,283 | $665,051 |
| Qualified investment per return | 160,094 | 221,684 |
| Applicable percentage | 7% | 10% |
| Credit claimed and disallowed | 11,207 | 22,168 |
| 1973 carryover to 1974 disallowed | 14,716 | 0 |
|  | 25,923 | 22,168 |

## OPINION

The question before us is whether in calendar years 1974 and 1975 petitioner is entitled to section 38 investment credit with respect to vehicles acquired by petitioner for use by other persons. In order to be entitled to the investment tax credit, petitioner must be the owner of the vehicle on which the credit is claimed. If the vehicle has been sold pursuant to a conditional sales contract, petitioner is not entitled to an investment tax credit on that vehicle. Therefore, resolution of the issue before us turns upon the proper characterization of the transactions between petitioner and the vehicle users, the terms of which were embodied in documents entitled "Lease Agreements." Respondent contends that the disputed agreements are conditional sales contracts, that petitioner does not own the vehicles covered by the "Lease Agreements," and that, therefore, petitioner is not entitled to the claimed investment tax credit. On the other hand, petitioner contends that the transactions are lease arrangements in form and substance, that it is the owner and lessor of the vehicles, and that it is entitled to the claimed investment credit.

Although for a number of years many Chrysler dealers apparently had been using the lease form utilized by petitioner in the years here in issue, we have found no tax case which deals with the issue of the entitlement to an investment tax credit involving leveraged open-end leases substantially similar to those here.

On brief, petitioner and respondent approach the problem by segregating the benefits and burdens of ownership retained by each of the parties to the transactions. We preface our discussion of these factors with the observation that under State and Federal laws an individual may be the owner of certain property for one purpose and yet not the owner of that identical property

for another purpose. For example, the owner of an object for purposes of State consumer protection laws may not be the owner of the same object for purposes of State or Federal tax laws. We will here address only the question of the ownership of the vehicles subject to the leases here involved for purposes of the Federal tax laws.

In separating those ownership burdens imposed from the ownership benefits bestowed upon the parties to the "Lease Agreements," respondent dissects the disputed contracts. In respondent's list of burdens inflicted upon the vehicle users are the payment of taxes, licensing, and registration fees; the expenses of operating and maintaining the vehicles; insurance premium costs; losses not covered by insurance if the vehicle was lost, stolen, or damaged; the cost of indemnifying petitioner, its officers, and employees against certain damages, injuries, claims, and expenses arising from the vehicles' conditions and operation; and the "risk of depreciable loss." Respondent enumerates the ownership burdens ascribable to petitioner as including only the risk of default by vehicle users and the risks of destruction or unprofitable sale of the used vehicles after their return to petitioner. Respondent catalogs the benefits attributable to the vehicle user as including the availability of the manufacturer's vehicle warranty, the transferability of the user's interest in the vehicle, the opportunity of realizing an appreciation in the value of the vehicle by exercising an option to purchase, and the utilization of the vehicle subject to certain restrictions on the conditions of its operation.

Respondent suggests that it is the party who bears the "risk of depreciable loss" who is the property owner for investment tax credit purposes. Respondent proposes that each time petitioner executed a "Lease Agreement," the risk of depreciable loss shifted from petitioner to the vehicle user. Respondent defines this "risk of depreciable loss" as the gamble that upon normal termination of the lease the actual value of the vehicle would be lower than the "depreciable value" stated in the "Lease Agreement." In that event, whether the valuation divergence resulted from market forces outside the control of the user or from the user's lack of care for the vehicle, the user would be liable for the difference. In support of his position, respondent cites passages from *Northwest Acceptance Corp. v. Commissioner*, 58 T.C. 836 (1972), affd. per curiam 500 F.2d 1222 (9th Cir. 1974),

and *Lockhart Leasing Co. v. Commissioner*, 446 F.2d 269 (10th Cir. 1971), affg. 54 T.C. 301 (1970).

In *Northwest Acceptance Corp. v. Commissioner, supra,* the taxpayer, a sales finance company, purchased contracts from heavy-equipment dealers. These contracts had been originally executed between the dealers and third parties, the latter of whom possessed and used the equipment pursuant to the written agreement provisions. The Government argued that those documents, labeled "leases," were actually contracts to sell the equipment to the third-party users. Consequently, the Commissioner took the position that the taxpayer was not entitled to depreciation deductions and investment tax credits with respect to the equipment covered by the agreements. The contracts in issue were standard form agreements which included provisions designating the duties of each contracting party. Among the duties specified as those of the user were assuring equipment operation by competent employees, maintaining the equipment in good repair at the user's expense, assuming the entire risk of loss and damage to the equipment, indemnifying the lessor from claims arising from the equipment and its use, providing theft and fire insurance, paying all license fees and taxes, and refraining from encumbering the equipment with any mortgage. On the other hand, the contract endowed the lessor with numerous privileges, including rights to retain legal title to the equipment, to assign the rents from the lease to third parties, and, in the event of default by the user, to repossess the equipment and accelerate all rentals due under the lease. The standard contract provided lessee with an option to purchase the equipment upon the normal termination of the contract. The option purchase prices specified in the agreements reflected a percentage of the initial cost of the equipment. The option prices ranged from 10 percent to more than 50 percent of the original equipment cost. Of the 136 disputed contracts, 21 included, or were accompanied by, dealer agreements to repurchase the equipment upon the termination of the contract. Twenty-nine of the 111 disputed documents containing purchase options also provided for dealer or third-party guarantees for full payment of the rentals due and exercise of the purchase option. In that case, we rejected as controlling the Government's argument that the taxpayer retained no "realistic residual interest in the equipment" because the risks of depreciable as well as actual loss

were shifted to the lessee or a third party by way of the provisions regarding the purchase option and guaranties to purchase. We explained that—

The option price set at the commencement of each lease was not, therefore, intended to force the lessee into an economic position such that it would have to exercise the option to make the lease a profitable venture. Furthermore, the options did not remove all risks of depreciation from the petitioner, for the lessees were in no way bound to exercise the option and, in the event the equipment was worth less than the option price at the option date or the lessees had no further use for it, they clearly were free to decline their right.

\* \* \* the presence of the dealer and third-party guaranties with regard to exercise of the options and payment of the rent under the contract does not conclusively establish that petitioner intended to sell the equipment to the lessee. The guaranties do not bind the lessees to purchase the equipment and petitioner's efforts to obtain them merely indicate its desire to make certain that the rented equipment would be disposed of with a minimum of effort and risk of loss should the residual value of the equipment be less than estimated at the time the lease was arranged. \* \* \* [*Northwest Acceptance Corp. v. Commissioner, supra* at 848].

*Lockhart Leasing Co. v. Commissioner, supra,* involved a subsidiary corporation engaged in the purchase of personal property for use by other persons. The principal business activity of the parent corporation was the ownership of stock of other companies. The taxpayer corporation did not maintain an inventory of equipment for use by other persons. Therefore, when an individual wished particular equipment, the taxpayer ordered and purchased it. To obtain the use of the equipment, the user executed with the taxpayer a document entitled "Equipment Lease Agreement." This agreement set forth the monetary terms and the period of payment (generally 48 months or less). The user's specified duties included the payment of all license fees and taxes, proper maintenance and operation of the vehicle, payment for all repairs at the user's expense, maintenance of liability and property damage insurance, and assumption of all risk of loss, theft, or damage to the equipment. The contract specified that the title to the equipment would be retained by the taxpayer. In event of default, the taxpayer had the right to repossess the equipment and accelerate the payments due under the contract. The form also provided a space to insert an amount representing the "Stipulated Loss Value" of the equipment. By requiring the user to purchase insurance coverage of not less than the "Stipulated Loss Value" amount, the taxpayer was assured that at the termination of the lease

period either the equipment would be returned in a condition that would yield a value at least as great as the stated "Stipulated Loss Value," or the insurance would pay the difference. Approximately 29 percent of the agreements contained purchase options exercisable by the user. The option price was approximately 10 percent of the original cost of the equipment to the taxpayer. Where a contract did not contain a purchase option, upon normal termination of the agreement often the user would negotiate the purchase of the equipment. With regard to 10 percent of the "Equipment Lease Agreements," the taxpayer obtained from third parties guarantees that the users would perform their obligations, and, in one instance, the guarantor warranted that it would buy the equipment covered by the agreement if the user failed to perform his contract obligations. The equipment covered by the agreements included machinery, office furniture, medical equipment, trailers, electronic and radio equipment, trucks, tractors, and other heavy equipment. In that case, the Commissioner argued that the disputed agreements were conditional sales contracts, that the taxpayer did not own the equipment covered by the "leases," and that, therefore, the taxpayer was not entitled to the claimed depreciation deductions and investment credits. Both the taxpayer and the Government relied upon cases which addressed the question of whether a document was in substance a sale or lease, but we pointed out that each case was factually distinguishable.[10] After an examination of all of the facts and circumstances, we held that the evidence did not support the Government's contention. We determined that an option to buy at the termination of the lease period did not require a conclusion that the transaction was a sale. We found that the rental payments and purchase option price were reasonably attributable to a lease, and we pointed out that in a fair number of instances, the property was actually returned to

---

[10]The cases cited by the taxpayer and the Government in *Lockhart Leasing Co. v. Commissioner*, 446 F.2d 269 (10th Cir. 1971), affg. 54 T.C. 301 (1970), included, among others, *Estate of Starr v. Commissioner*, 30 T.C. 856 (1958), revd. on other grounds 274 F.2d 294 (9th Cir. 1959); *Mt. Mansfield Television, Inc. v. United States*, 239 F. Supp. 539 (D. Vt. 1964), affd. per curiam 342 F.2d 994 (2d Cir. 1965); *Breece Veneer & Panel Co. v. Commissioner*, 232 F.2d 319 (7th Cir. 1956), revg. 22 T.C. 1386 (1954); *Smith v. Commissioner*, 51 T.C. 429 (1968). In the instant case, the parties cite and discuss a number of these cases, and we find that each of the cases is factually distinguishable from the case at bar.

the taxpayer at the normal termination of the lease period. In affirming our decision, the Circuit Court agreed with our analysis and stated:

It cannot be said that any one element present in the agreements is conclusive on the depreciation question, including an option to purchase; nor can it be said that all provisions considered together place the burdens of ownership on the customer to the extent that the agreement transferred from the taxpayer a depreciable interest in the equipment. * * * [*Lockhart Leasing Co. v. Commissioner*, 446 F.2d 269, 271 (10th Cir. 1971), affg. 54 T.C. 301 (1970).]

We do not agree with respondent's contention that the above-cited excerpts from *Lockhart Leasing. Co. v. Commissioner, supra*, and *Northwest Acceptance Corp. v. Commissioner, supra*, signify that where an agreement shifts the "risk of depreciable loss" from the taxpayer to another party, that document is a conditional sales contract rather than a lease. If we were to accept respondent's proposal, for tax purposes all open end leases necessarily would be recharacterized as conditional sales contracts.[11] This result is not supported by the decided cases.

---

[11]Whether a lease is open end or closed end depends on who assumes the risk fluctuation in the residual value of the leased property at the time of the lease termination. Where the lessee assumes the risk of residual value fluctuation, the lease is called "open end"; otherwise it is a closed end lease. See *M & M Leasing Corp. v. Seattle-First National Bank*, 563 F.2d 1377, 1379 (9th Cir. 1977); affg. in part and revg. in part 391 F. Supp. 1290 (W.D. Wash. 1975); J. Ayer, "Clearing the Smog Surrounding Consumer Auto Leasing," 6 Pac. L. J. 447, 449 n. 3 (1975). In *M & M Leasing Corp.*, the courts faced the question of whether the defendant was engaging in leasing activities not within the scope of those bank activities authorized under the National Bank Act, 12 U.S.C. sec. 24, subdiv. 7. The District Court indicated that there are two basic types of motor vehicle leases—closed end and open end. In listing the general characteristics of the open end motor vehicle lease, the District Court stated:

"(1) The lease is usually for a term of from twenty-four to thirty-six months.

"(2) The lessee assumes the risk of loss of, or damage to, the leased vehicle. Before he takes possession, the lessee is required to insure the automobile, naming the lessor as loss payee.

"(3) The lessee assumes all responsibility for repair and maintenance of the leased vehicle.

"(4) The lessee promises to make fixed monthly payments during the life of the lease and to make a final lump-sum payment at the end of the lease. This lump-sum amount, known as the guaranteed residual, is based upon a projection of the expected re-sale value of the leased vehicle, and it is anticipated that this payment will be produced from sale of the car. If it is not, the lessee pays the balance. If sale proceeds exceed the guaranteed residual, the excess is refunded to the lessee.

"(5) The lease payments plus the guaranteed residual payment return to the lessor its original investment in the automobile (the purchase price), its cost of financing, all related overhead expenses, and a profit.

"(6) The lessee does not have a specified option to purchase the vehicle at the conclusion of the lease period.

"The 'closed-end' lease differs from the open-end lease in one important detail: the lessee does not guarantee the residual value of the leased vehicle at the end of the lease; the lessor assumes that risk. * * * [*M & M Leasing Corp. v. Seattle-First National Bank*, 391 F. Supp. 1290, 1293–

Clearly, the passages we have quoted from *Lockhart Leasing Co.* and *Northwest Acceptance Corp.* reveal that the risk of fluctuation in the residual value of leased property is only one factor among many to be considered in determining whether a contract is in substance a lease or a sales agreement.

In making our determination, we are concerned with the economic substance of the transactions in the case at bar. Upon normal termination of the "Lease Agreement," the motor vehicle user was responsible for returning to petitioner a vehicle worth at least the stated "depreciated value." If unable to fulfill this obligation when returning the vehicle, the user had the additional duty of paying to petitioner the difference in the values.[12] Yet, if the user were astute, pursuant to petitioner's unannounced business practices, the user could pay in cash this depreciated value and retain the car for his own purposes. Because the depreciated value was a reasonable projection of the fair market wholesale value of the particular vehicle upon lease termination, if the user retained the car, paid the petitioner the stated wholesale value, and sold the car to a third party at retail, he could have offset any potential loss attributable to fluctuations in the vehicle's residual value. In our view, the inclusion of a contract provision that shifts the depreciable loss to the extent of wholesale value away from the taxpayer in an attempt to minimize business risks does not control for purposes of determining whether the agreement is a lease or conditional sales contract.

In an attempt to support his contention that the "Lease Agreements" were conditional sales contracts, respondent takes

---

1294 (W.D. Wash. 1975).]"

The District and Circuit Courts in *M & M Leasing Corp. v. Seattle-First National Bank, supra,* held that the business of banking, authorized by the National Bank Act, *supra,* includes the leasing of personal property where, in substance, the transaction constitutes a loan of money secured by properties leased. A lease ceases to be a secured loan authorized as a banking function under the National Bank Act when the lessor assumes material burdens other than those of a lender and is subject to significant risk not ordinarily incident to a secured loan. The Circuit Court stated that for purposes of determining risks allowed to be taken by national banks, closed end leases do not impose "significantly more onerous economic burdens on banks than do open end leases." *M & M Leasing Corp. v. Seattle-First National Bank,* 563 F.2d at 1381.

[12]This same responsibility attached to the user in the event of premature termination of the contract, except that the user was responsible for paying the rental which would have been collected had the lease not prematurely been terminated, plus a pro rata share of the license or tax fees.

two other approaches as to how the stated "Depreciated Value" should be viewed. Respondent states that the "Depreciated Value" was an option to purchase exercisable by the vehicle user, or in the alternative, that it merely represented a balloon payment payable at the termination of the contract period. Above we indicated that an astute user could retain the car if willing to pay petitioner the stated "Depreciated Value"; however, we are of the opinion that in entering the "Lease Agreements," the intent of the parties was not to provide for a purchase option. The record indicates that the taxpayer intended to minimize his business risk by assuring the return of a vehicle in satisfactory condition for subsequent retail sale as a used car from which it could earn another profit. In fact, the testimony indicates that petitioner heavily relied upon the return of the vehicles covered by the "Lease Agreements" as a source of its used car inventory.

While we are of the opinion that there existed no formal purchase option, even if an informal option to purchase existed, such purchase option price, which in most instances was far from nominal, was based upon the expected wholesale value of the vehicle at the time the user could exercise the option. As we stated and the Circuit Court confirmed in the *Lockhart Leasing Co.* case, the existence of an option to purchase at the end of a contract period does not mandate the conclusion that the transaction was in substance a sale. *Lockhart Leasing Co. v. Commissioner*, 54 T.C. 301, 314 (1970), affd. 446 F.2d 269, 271 (10th Cir. 1971). See also *LTV Corp. v. Commissioner*, 63 T.C. 39, 50 (1974); *Northwest Acceptance Corp. v. Commissioner, supra* at 847.

We also are of the view that the stated "depreciated value" did not represent a balloon payment due at the end of the term of a conditional sales contract. First, between 38 percent and 53 percent of all vehicle users did not pay the stated "depreciated value" but instead returned the vehicle.[13] As we pointed out in

---

[13]The following table indicates the percentage of vehicles returned to petitioner at normal termination of the lease period and the percentage of users or third parties who retained the vehicle and paid to petitioner the depreciated value.

*"Lease Agreements" Executed in Fiscal Year Ending 8/24/73*

All = 210 agreements = 100%

    44%    paid off by the user

    13%    paid off by someone other than the user (including those paid off by

*Bowen v. Commissioner*, 12 T.C. 446, 459 (1949), a lease contemplates the use of property for a definite time period at the expiration of which the property is returned to the lessor; a conditional sales contract from the beginning does not contemplate return of the property, but rather intends continuous possession by the user with ultimate ownership actually vesting at a future time. Moreover, an examination of the "Lease Agreements" in this case reveals that in the vast majority of instances, the stated "depreciated value" was at least 25 percent

someone other than the user pursuant to user's sale)

39% returned to petitioner and held in petitioner's inventory (includes repossessions, some of which were voluntary)

4% other

Disputed = 148 agreements = 100%

53% paid off by the user

16% paid off by someone other than the user (including those paid off by someone other than the user pursuant to user's sale)

30% returned to petitioner and held in petitioner's inventory (includes repossessions, some of which were voluntary)

1% other

*"Lease Agreements" executed in 1974*

All = 137 agreements = 100%

33% paid off by the user

12% paid off by someone other than the user (including those paid off by someone other than the user pursuant to user's sale)

53% returned to petitioner and held in petitioner's inventory (includes repossessions of which some were voluntary)

2% other

Disputed = 105 agreements = 100%

37% paid off by the user

15% paid off by someone other than the user (includes those paid off by someone other than the user pursuant to user's sale)

46% returned to petitioner and held in petitioner's inventory (includes repossessions of which some were voluntary)

2% other

*"Lease Agreements" executed in 1975*

All = 159 agreements = 100%

43% paid off by the user

16% paid off by someone other than the user (includes those paid off by someone other than the user pursuant to sale by the user)

38% returned to petitioner and held in petitioner's inventory (includes repossessions, some of which were voluntary)

3% other

Disputed = 130 agreements = 100%

47% paid off by the user

13% paid off by someone other than the user (includes those paid off by someone other than the user pursuant to sale by the user)

37% returned to petitioner and held in petitioner's inventory (includes repossessions, some of which were voluntary)

3% other

of the stated capitalized cost. Clearly, this is not a case in which the total rental payments paid all but a nominal amount of the cost of the leased property. If from the beginning the user intended to retain the car, most often it would have been more cost beneficial for him to have given the taxpayer a downpayment (usually less than 25 percent in the automobile sales business) and to have obtained a loan on the balance from a financial institution. By petitioner's admission, leases provided more profitable returns on its money than sales and were probably more costly in the long term to the vehicle user.

Petitioner asserts that an analysis of the significance of the burdens and benefits attributable to petitioner and to the vehicle users should be made in light of *Frank Lyon Co. v. United States*, 435 U.S. 561, 98 S. Ct. 1291 (1978). The facts of *Frank Lyon Co. v. United States* are distinguishable. Nevertheless, the case is imbued with features significant to the case at bar, and consequently, we look to the *Frank Lyon Co.* case for some guidance.

In *Frank Lyon Co. v. United States, supra*, the taxpayer, Frank Lyon Co., entered into a sale and lease-back agreement with Worthen Bank & Trust Co. Under the terms of the agreement, Lyon obtained both construction and permanent financing from third parties to construct a building for use by the Worthen Bank as its headquarters and as a principal banking facility. The bank was obligated to pay rent equal to the principal and interest payments due on the taxpayer's mortgages. Under the terms of the agreement, the bank had an option to repurchase the building at various times for prices equal to the then-unpaid balance of the taxpayer's mortgage and initial investment. On its Federal income tax return petitioner claimed, inter alia, a depreciation deduction on the building for that year in which the structure was completed and the bank took possession. The Government argued that the taxpayer was not entitled to the claimed depreciation deductions because the taxpayer was not the owner of the building for tax purposes. The Supreme Court made an exhaustive list of those factors relating to the substance and economic realities of the transaction and held that the taxpayer was entitled to the depreciation deduction. In so holding, the Supreme Court stated:

> In short, we hold that where, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by

business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. Expressed another way, so long as the lessor retains significant and genuine attributes of the traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes. What those attributes are in any particular case will necessarily depend upon its facts. * * * [*Frank Lyon Co. v. United States*, 435 U.S. 561, 583–584 (1978).]

In considering the economic substance of the transactions in dispute, we are of the opinion that petitioner was in fact a lessor and that the users were lessees. Petitioner's leasing operations were encouraged by the economic realities of business. By transacting business through lease arrangements, petitioner was able to make larger profits in the years in issue than if it had operated solely as a sales business. Reasons for this profit structure included payments made to petitioner by Chrysler Corp. under a lease incentive program, the profit structure built into the "Lease Agreements," and the ability to make profitable sales on the cars formerly covered under the "Lease Agreements."

On the basis of this record, we conclude that petitioner retained risks and responsibilities commensurate with the status of a lessor. Petitioner was responsible for the monthly repayment of its loans from the banks regardless of whether the vehicle users timely paid petitioner or whether the users defaulted. In the years in issue, petitioner maintained contingent bodily injury and property damage insurance with respect to the leased vehicles, and during the last 3 months of 1975, it also maintained contingent physical damage insurance. Petitioner would not have purchased this insurance had it not had an interest in the vehicles. Petitioner assumed the risks attributable to default by users, namely nonrecovery of the owed moneys in the event of insolvency of the lessee, and, in addition, the risk of a negative cash flow if default occurred within the first half of the lease. Petitioner also assumed the risk of receiving at termination of the lease a vehicle not subject to sale at the previously anticipated retail price.

As in *Lockhart Leasing Co. v. Commissioner*, 446 F.2d 269 (10th Cir. 1971), affg. 54 T.C. 301 (1970), petitioner's bookkeeping procedure supports our determination. Petitioner's separate records for the sales and Swift Leasing Co. divisions, method of paying its personnel, and detailed separate records on each of

the leased cars indicate that the leasing operations of Swift Leasing Co. had economic substance.

Finally, in making this determination, we also have noted such factors as: the reasonableness of the monthly rental payments in light of the market and type of property leased, the lease provision that no title passed to the lessee, the lease provision allowing petitioner to assign to third parties the right to receive rents from the leased vehicles, and the fact that in 29 instances, the terms of the original lease were extended.

The contract provisions utilized by petitioner were an attempt to minimize its business risks. While some of the ownership burdens were shifted to the vehicle users, this shift does not raise the presumption of a sale instead of a lease. *Northwest Acceptance Corp. v. Commissioner*, 58 T.C. 836, 850 (1972), affd. per curiam 500 F.2d 1222 (9th Cir. 1974). We are of the opinion that petitioner retained sufficient investment and ownership benefits and burdens to resolve the issue in its favor.

As stipulated by the parties, by virtue of the merger and section 381, petitioner is entitled to the unused fiscal year 1973 investment credit of Swift Leasing Co.

*Decision will be entered for the petitioner.*