**M & M LEASING CORPORATION et al.,**
**Plaintiffs,**

v.

**SEATTLE–FIRST NATIONAL BANK**
**et al., Defendants.**

**M & M LEASING CORPORATION et al.,**
**Plaintiffs,**

v.

**PEOPLES NATIONAL BANK et al.,**
**Defendants.**

**Civ. Nos. 508–73C2, 509–73C2.**

United States District Court,
W. D. Washington.

March 14, 1975.

As Amended April 10, 1975.

John P. Lycette, Jr., and Craig S. Sternberg, Lycette, Diamond & Sylvester, Seattle, Wash., for plaintiffs.

Rex M. Walker and Bradley C. Diggs, Davis, Wright, Todd, Riese & Jones, Seattle, Wash., for defendants Seattle-First Nat. Bank and Firstbank Leasing Corp.

D. Gordon Willhite, MacBride, Sax & MacIver, Seattle, Wash., for defendants Peoples Nat. Bank and Peoples Leasing Co.

James V. Elliott and Dorothy S. Kulig, Washington, D. C., and Charles F. Mansfield, Asst. U. S. Atty., for James E. Smith, Comptroller of the Currency.

## OPINION

MORELL E. SHARP, District Judge.

These cases, consolidated for a nonjury trial before this Court, involve the legality under the National Bank Act, 12 U.S.C. § 24, of the motor vehicle leasing activities of national banks and their subsidiaries.

The plaintiffs, M & M Leasing Corporation; Goodway Leasing, Inc.; Bill Pierre Leasing, Inc.; and Budget Rent-A-Car of Washington-Oregon, Inc., are independent corporations engaged principally in motor vehicle leasing. De-

fendants Seattle-First National Bank (Seattle-First) and Peoples National Bank of Washington (Peoples) are engaged in the leasing of many products, including motor vehicles, either directly or through their respective subsidiaries, defendants Firstbank Leasing Corporation and Peoples Leasing Company. Defendant James E. Smith is Comptroller of the Currency (Comptroller), whose office has authorized personal property leasing by national banks and their subsidiaries by interpretive rulings, 12 C.F.R. §§ 7.3400 and 7.7376.

The plaintiffs seek a declaration that the Comptroller's sanction of personal property leasing by national banks is invalid with respect to motor vehicle leasing because not authorized by 12 U.S.C. § 24 (Seventh). The plaintiffs also request an injunction barring defendant banks and their subsidiaries from further motor vehicle leasing activities. Even if the Comptroller's interpretive rulings are valid, plaintiffs argue that the defendant banks' activities have exceeded this authorization and should be enjoined to that extent.

The National Bank Act, 12 U.S.C. § 24 (Seventh), grants national banks the power

"To exercise by its board of directors or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provisions of this chapter. . . ."

The challenged Comptroller's interpretive ruling, 12 C.F.R. § 7.3400, states:

"A national bank may become the owner or lessor of personal property acquired upon the specific request and for the use of a customer and may incur such additional obligations as may be incident to becoming an owner and lessor of such property. Lease transactions do not result in obligations for the purpose of 12 U.S.C. 84. Since the lease payments are in the nature of rent rather than interest, 12 U.S.C. 85 and 86 are not applicable."

Also involved is the interpretive ruling regarding operating subsidiaries, 12 C.F.R. § 7.7376, which states in part:

"(a) *General rule.* With the prior approval of the Comptroller of the Currency, a national bank may engage in activities, which are a part of the business of banking or incidental thereto, by means of an operating subsidiary corporation. In order to qualify as an operating subsidiary hereunder, at least 80 percent of the voting stock of the subsidiary must be owned by the parent bank.

"(b) *Activities permitted.* An operating subsidiary may perform any business function which the parent bank is permitted to perform. For example, through a bank department or an operating subsidiary, a national bank may issue credit cards, service mortgages, lease property, offer travel services, or operate a credit bureau."

Plaintiffs' principal contention is that the "business of banking" does not include motor vehicle leasing. Defendants claim that such leasing is in substance the equivalent of traditional loan financing, which always has been a banking function and therefore falls within the scope of bank activities permitted by 12 U.S.C. § 24 (Seventh).

## FACTUAL BACKGROUND

In 1963 James J. Saxon, then Comptroller, issued the interpretive ruling, presently 12 C.F.R. § 7.3400, which authorizes the leasing of personal property by national banks. Today there are at least 650 national banks engaged in such leasing activity, with leases worth more than $2 billion. In addition, the state-chartered banks of forty states are authorized either by state statute or by administrative regulation to engage in per-

sonal property leasing, and the value of such leasing is about $1 billion. Much of bank leasing activity involves so-called "big ticket" items, such as aircraft and ships. Motor vehicle leasing by banks is a relatively recent phenomenon; for example, Peoples entered this field in February of 1972, Seattle-First in April of 1973.

Almost all of the defendant banks' motor vehicle leases are dealer-generated leases.[1] Each bank has entered into agreements with many franchised automobile dealers whereby the bank agrees to purchase leases generated by the dealer. The dealer is usually free to lease vehicles under any conditions satisfactory to him. He concludes the lease transaction with the lease customer, makes delivery of the automobile, and then promptly assigns the lease paper to the bank. However, before a dealer-generated lease is accepted by the bank, the bank approves both the substantive terms of the lease and the credit-worthiness of the lessee. The bank requires a higher credit rating for a lease customer than it does for a customer who purchases an automobile with a substantial down payment and a time-payment contract. The bank pays the dealer an agreed price for the lease, generally purchasing the paper without recourse. The vehicle title application is completed with the bank as the legal owner and the customer as the registered owner and lessee. The bank notifies the lease customer that the lease has been assigned to the bank, and payments are made to the bank by the lessee throughout the life of the lease.

A small number of the banks' automobile leases are direct leases, initiated by prospective lease customers who call at a bank and express the desire to lease a vehicle. The customer indicates the particular car and accessories which he desires to lease, and the bank determines whether the customer qualifies on a credit basis. If so, the customer is directed to select a car from a franchised dealer. After he has made his automobile selection, the bank acquires the vehicle by paying the dealer an agreed purchase price. The dealer then makes delivery directly to the lessee, and the lessee makes payments directly to the bank as agreed in the lease.

While practices and methods vary somewhat within the leasing business, generally there are two basic types of motor vehicle leases, "open-end" leases and "closed-end" leases. The "open-end" lease has the following general characteristics:

(1) The lease is usually for a term of from twenty-four to thirty-six months.

(2) The lessee assumes the risk of loss of, or damage to, the leased vehicle. Before he takes possession, the lessee is required to insure the automobile, naming the lessor as loss payee.

(3) The lessee assumes all responsibility for repair and maintenance of the leased vehicle.

(4) The lessee promises to make fixed monthly payments during the life of the lease and to make a final lump-sum payment at the end of the lease. This lump-sum amount, known as the guaranteed residual, is based upon a projection of the expected resale value of the leased vehicle, and it is anticipated that this payment will be produced from sale of the car. If it is not, the lessee pays the balance. If sale proceeds exceed the guaranteed residual, the excess is refunded to the lessee.

(5) The lease payments plus the guaranteed residual payment return to the lessor its original investment in the automobile (the purchase price), its cost of financing, all related overhead expenses, and a profit.

---

1. For ease of exposition, throughout this opinion "banks" is used when referring to either the banks or their subsidiaries.

(6) The lessee does not have a specified option to purchase the vehicle at the conclusion of the lease period.

The "closed-end" lease differs from the open-end lease in one important detail: the lessee does not guarantee the residual value of the leased vehicle at the end of the lease; the lessor assumes that risk. Almost all of the motor vehicle leases held by defendant banks are open-end leases. However, the banks occasionally obtain some closed-end automobile leases when they purchase lease portfolios from independent leasing companies.[2] Also, many leases of big ticket items are closed-end, though often the lease term is calculated to span the usable life of the leased goods, leaving no residual value above salvage value.

One of three things ordinarily happens at the termination of an open-end lease. Although the lessee does not have the formal option to purchase the automobile, he may pay off the guaranteed residual himself, in which case the car is transferred to him or his designee. Otherwise, the automobile is offered to the franchised dealer from whom it was purchased. If the franchised dealer does not purchase the vehicle, the bank usually wholesales it to some other dealer, although occasionally the bank may lease the automobile again if it is not too old.

## ANALYSIS

To assist the Court in resolving the dispute over the true nature of these motor vehicle lease transactions, plaintiffs emphasize the following facts:

First, the defendant banks use documents denominated "leases" in these transactions, and the terminology throughout the documents is that of bona fide lease agreements.

Second, the banks do not set out finance charges in these agreements.

They do not comply with either the Truth in Lending Act, 15 U.S.C. § 1601 et seq., or the Retail Installment Sales Act, R.C.W. 63.14. The Comptroller's interpretive ruling itself, 12 C.F.R. § 7.-3400, exempts personal property leases from certain limits imposed by Congress on interest charges and on the extent of loans to any one entity. Furthermore, the parties have stipulated in the pretrial order that the state usury statute does not encompass these transactions.

Third, no Washington state sales tax is paid by the lease customer on the original purchase of the automobile; instead, sales tax is paid on the monthly lease payments.

Finally, for tax accounting purposes, Seattle-First treats itself as the lessor of its leased motor vehicles, taking depreciation deductions and the investment tax credit. Peoples does not take these tax benefits in its motor vehicle leasing transactions, but both banks utilize these tax advantages in leases of big ticket items.[3]

These facts, though important considerations, are not determinative of the proper classification of these transactions. It is the substance, not the form, of the transactions which must govern. The difficulty with classifying motor vehicle leases as either bona fide leases or loan financing mechanisms is that, in this era of sophisticated financial relationships, there is no clear boundary between the two. Rather, there is a spectrum of financial relationships ranging from the unequivocal operating lease (such as the daily automobile rental) at one end to the traditional personal loan at the other end.

The defendant banks themselves conceive of vehicle leases as a species of legal chameleon: they resemble bona fide leases whenever resting upon a tax return or an interest disclosure form; yet

2. Often this purchase agreement contains a guarantee by the dealer of the vehicle residual values. In such cases the leases are essentially equivalent to open-end leases, the only difference being the identity of the residual value guarantor.

3. See Lockhart Leasing Co. v. United States, 446 F.2d 269 (10th Cir. 1971); Rev.Rul. 55–540, 1955–2 Cum.Bull. 39.

they cannot be distinguished from ordinary loans when examined against the background of the National Bank Act.[4] Even though defendants receive seemingly inconsistent treatment from different governmental agencies, this Court is concerned only with the substance of these transactions within the context of the National Bank Act.

■ In my opinion, the open-end motor vehicle lease, which is the usual form, is merely a variation in the traditional manner of extending credit and is the functional equivalent of a loan on personal security. Specifically, the open-end lease differs only insignificantly from a conditional sales contract with a final balloon payment. The lease customer assumes all of the burdens and risks of ownership of the automobile. The bank, during the lease term, is repaid the cost of the vehicle together with the cost of financing the transaction out of a combination of rentals and guaranteed residual payment, and sometimes tax benefits also. The bank is promised a pre-established financial return, with only the usual risks inherent in any credit transaction.

■ The closed-end vehicle lease, on the other hand, is not functionally equivalent to a loan because the lessee does not guarantee the residual value of the car. The risk of downward fluctuation in that value falls on the bank; this fact sets the closed-end vehicle lease apart from an ordinary loan. A closed-end lease is equivalent to a loan only if written for a term which exhausts the usable life of the leased property so that the bank does not rely on any residual value in its calculation of its expected financial return. Closed-end vehicle leases do not meet this criterion.

The conclusion that open-end vehicle leases, but not closed-end leases, as they are defined above, are equivalent to loan financing does not end our inquiry. Still remaining is the task of interpreting the National Bank Act, 12 U.S.C. § 24 (Seventh), to decide whether either lease type fits within the scope of authorized national bank activities.

■ At the outset it should be noted that the Comptroller's interpretation of the scope of this statute, while entitled to significant weight, is not dispositive. It is the function of the judiciary, not of an administrative agency, to ascertain finally the legitimate bounds of statutory authority. Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

Plaintiffs argue that the "business of banking" authorized by § 24 (Seventh) is limited to those functions which are expressly enumerated in the statute and those which are necessarily incidental to the enumerated functions. Since "leasing" is not found on the list of specific powers, plaintiffs contend that leasing is not a statutorily authorized national bank power. Plaintiffs rely heavily on Arnold Tours, Inc. v. Camp, 472 F.2d 427 (1st Cir. 1972), in which the First Circuit held that operation of travel agencies was outside the scope of § 24 (Seventh).

Defendants emphasize the wisdom of interpreting the statutory language, which dates back to 1864, with the flexibility necessary in order to allow national banks to maintain pace with modern developments in financial instruments and to serve the changing needs of their customers. Several decisions have indicated the desirability of such a flexible interpretation. *See, e. g.,* Colorado National Bank v. Bedford, 310 U.S. 41, 60 S.Ct. 800, 84 L.Ed. 1067 (1940); First National Bank v. National Exchange Bank, 92 U.S. 122, 23 L.Ed. 679 (1875).

---

4. Defendants are not the first to assert semantic omnipotence.

"'When *I* use a word,' Humpty Dumpty said, in rather a scornful tone, 'it means just what I choose it to mean—neither more nor less.'

"'The question is,' said Alice, 'whether you *can* make words mean so many different things.'

"'The question is,' said Humpty Dumpty, 'which is to be master—that's all.'" L. Carroll, *Through the Looking-Glass* 130 (St. Martin's Press 1968).

It is unnecessary for this Court to resolve this conflict between two competing theories of statutory construction, for I conclude that open-end vehicle leases are authorized even by a narrow reading of the statute. The *Arnold Tours* opinion stated plaintiffs' position as follows, 472 F.2d at 432:

"In our opinion, these decisions amply demonstrate that a national bank's activity is authorized as an incidental power, 'necessary to carry on the business of banking,' within the meaning of 12 U.S.C. § 24, Seventh, if it is convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers under the National Bank Act. If this connection between an incidental activity and an express power does not exist, the activity is not authorized as an incidental power."

Elsewhere the court noted, 472 F.2d at 431:

"The most reliable guides as to what is encompassed in the term 'the business of banking' are the express powers of national banks as set out in the National Bank Act. And when one looks at past decisions it becomes apparent that the activities of national banks which have been held to be permissible under the 'incidental powers' provision have been those which are directly related to one or another of a national bank's express powers."

It is clear from the foregoing analysis of the substance of the open-end vehicle lease that it is directly related to two of the national banks' express powers. Authorization for direct open-end leases is found in the grant of power of "loaning money on personal security." Dealer-generated open-end leases are directly related to the power of "discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt."

Closed-end vehicle leases, on the other hand, are not authorized by even an expansive reading of § 24 (Seventh). When a bank's financial return from a lease arrangement depends to any extent upon the residual value of the leased property, it has left the business of banking and entered the realm of speculative ventures.

Therefore, I conclude that the defendant banks are authorized by the National Bank Act to engage in open-end motor vehicle leasing activities. They are not empowered to engage in any closed-end lease transactions in which the banks assume any risk of residual value fluctuations. The Comptroller's interpretive rulings are invalid only to the extent that they approve of such closed-end leases.

Plaintiffs' final argument is that, even if the Comptroller's rulings are valid, the defendant banks have exceeded the authority granted to them. Specifically, plaintiffs contend that the banks' solicitation of leasing business from the general public exceeds the Comptroller's approval of acquisition of personal property "upon the specific request and for the use of a customer." 12 C.F.R. § 7.3400. However, having found that open-end leasing is a power authorized by the National Bank Act, there is no logical or statutory basis for limiting a bank's use of the power by restricting its lessees to persons who utilize other services of the lessor bank.

This opinion shall constitute findings of fact and conclusions of law.

## ORDER ON RECONSIDERATION

Defendants seek clarification of the opinion issued March 13, 1975, wherein this Court found a certain type of closed-end lease to be outside the powers granted to national banks by the National Bank Act. Defendants' concern is that the opinion does not adequately distinguish between closed-end leases providing for full pay-out on the one hand, and closed-end leases which do not provide for full pay-out on the other hand. Since the banks participate in many closed-end leases of "big ticket" items, their concern is understandable. I am issuing this Order to obviate misinterpretation of the decision. As noted

in the opinion, the National Bank Act does not empower banks to engage in any lease transaction in which the bank assumes the risk of residual value fluctuation. Lease transaction in which the lessor bank, during the initial lease term, is repaid the cost of the property leased plus the cost of financing the transaction, in the form of rentals, tax benefits and/or the guarantee of a financially responsible guarantor, are within the powers enumerated in the National Bank Act and neither disapproved in the Court's opinion nor enjoined by the judgment entered herein. Leases in which the lessor must look to the residual value of the leased property to realize its financial return are not within the powers authorized in the Act.

The judgment provides that the defendants are enjoined from engaging in "motor vehicle lease transactions in which the banks assume the risk of residual value fluctuation upon termination of the lease." Plaintiffs and the defendant banks move to amend this judgment by deleting its reference to "motor vehicles." Defendant Comptroller, however, objects to this amendment on the basis that, since the plaintiffs are engaged almost exclusively in motor vehicle leasing, only such leasing can be affected by the Court's decision. The Court sees no basis for distinguishing between the general activity of leasing and the activity of leasing a particular commodity. Neither the Comptroller's regulations, nor the Federal Reserve Board's rules as applied to bank holding companies and their non-bank subsidiaries, make such a distinction. Nor, in fact, did the defendants, including the Comptroller, make such a distinction in the trial of this case. On the contrary, the evidence presented by the defendants and, in particular, by the Comptroller, covered the entire range of defendant banks' personal property lease financing. Accordingly, the opinion and the judgment herein are applicable thereto.

The Clerk of this Court is hereby ordered to enter an amendment to the judgment deleting the words "motor vehicle."