*Decision will be entered for the respondent.*

LESLIE LEASING COMPANY, A.K.A. LESLIE FINANCE AND LEASING COMPANY, A CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 16498–79.    Filed February 15, 1983.

*Charles W. Tuckman*, for the petitioner.
*Robert W. Towler*, for the respondent.

SHIELDS, *Judge:* * Respondent determined deficiencies in petitioner's 1975 and 1976 Federal income taxes in the respective amounts of $40,575 and $64,171. After concessions by both parties,[1] the remaining issues for decision are: (1) Whether petitioner's commercial, open-end "leases" are qualified motor vehicle agreements within the meaning of section 210, Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97–248, 96 Stat. 324, 477; and (2) whether petitioner is entitled to an investment credit for vehicles it acquired for use by consumers pursuant to open-end "leases."[2]

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation and exhibits attached thereto are incorporated herein by this reference.

Petitioner Leslie Leasing (the company) had its principal place of business at San Francisco, Calif., at the time it filed the petition in this case. Petitioner timely filed corporate income tax returns for 1975 and 1976 with the Internal Revenue Service Center at Fresno, Calif.

For 1975 and 1976, petitioner claimed an investment credit on items of property leased in the ordinary course of business under both closed-end and open-end leases, including carryovers from 1973, 1974, and 1975. In his notice of deficiency, respondent disallowed all of the investment credit claimed, including carryovers, on the ground that the leases in substance were conditional sales contracts. At trial, respondent

---

*This case was tried before Judge Cynthia Holcomb Hall who subsequently resigned from the Court. By order of the Chief Judge, the case was reassigned to Judge Perry Shields for disposition.

[1]Petitioner claimed attorney's fees and costs in its petition but appears to have abandoned that issue since it was not raised at trial or on brief. Nonetheless, it is clear that we are without jurisdiction to award such fees and costs for the years in issue. *McQuiston v. Commissioner*, 78 T.C. 807 (1982). But see sec. 292, Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97–248, 96 Stat. 324, 572, which provides for the award of attorney's fees and costs to a prevailing party in cases commenced in the Tax Court after Feb. 28, 1983.

[2]The terms "lease(s)," "lessor," and "lessee" as used in the findings of fact are not intended to describe the character of the transactions in question, but instead are used solely for purposes of clarity and convenience.

conceded that petitioner's closed-end leases executed in 1973 through 1976 were true leases. Following submission of briefs, respondent also conceded that petitioner's open-end leases which qualified as motor vehicle agreements under the 1982 Revenue Act were not conditional sales.

Leslie Leasing was incorporated in 1949 and operated until 1976 as Leslie Finance & Leasing Co. In 1963, petitioner sold its finance contracts to a commercial credit company. During the years in issue, Leslie Leasing engaged in automobile, truck, and equipment leasing. Eighty-five percent of its business was generated by commercial lessees, the remaining 15 percent by consumer lessees. Although petitioner did not sell new vehicles, it sold used vehicles on the wholesale market. In addition to its automobile leasing activities, Leslie Leasing operated a daily rental fleet and leased equipment. More than half of its commercial business involved fleet accounts of 5 or more vehicles. In 1975 and 1976, the company had 2,500 vehicles on lease, which produced an annual gross rental income of $5 million. The company repossessed approximately 20 vehicles per year because lessees were delinquent in making rental payments or were bankrupt.

Petitioner employed closed-end and open-end leases in 1975 and 1976. Under the closed-end lease, petitioner determined a rental fee based, in part, on the number of miles the customer anticipated driving. At the end of the term, petitioner would charge the customer for any excess mileage or abnormal wear and tear. Under the open-end lease, petitioner based the final rental payment or credit on the vehicle's market value at the end of the term.[3] The anticipated value of the vehicle was identified in the contract as the residual value.

Petitioner secured recourse loans to finance the purchase of its vehicles through the Wells Fargo Bank and the Sumitomo Bank of California. During the years before the Court, the company owned outright about 10 percent of its vehicles and

---

[3]"The closed-end lease differs from the open-end lease in one important detail: the lessee does not guarantee the residual value of the leased vehicle at the end of the lease; the lessor assumes that risk." *M & M Leasing Corp. v. Seattle-First National Bank*, 391 F. Supp. 1290, 1294 (W.D. Wash. 1975), affd. in part and revd. in part 563 F.2d 1377 (9th Cir. 1977). Whether a lease is open-end or closed-end depends on who assumes the risk of fluctuation in residual value of the leased property when the lease terminates. When the lessee assumes this risk, the lease is called open-end; otherwise, it is a closed-end lease.

financed the remaining 90 percent. Petitioner repaid borrowed amounts over a fixed term, ordinarily 24 to 36 months. It made equal payments of principal each month plus interest on the unpaid balance, ending with a balloon payment. In the security agreements with its primary lenders, the company warranted that it was the lawful owner of the vehicles and that the vehicles were free of all liens, taxes, and encumbrances.

The security agreement between petitioner and the bank, and the lease agreement between petitioner and the customer, were two distinct documents. The banks did not look to lessees for payments on their loans to petitioner, even though the vehicle and lease agreement were pledged as security for a loan. However, the banks sometimes checked the credit of potential lessees and advised petitioner on occasion that they would not be willing to finance a vehicle leased to a particular individual. During the early months of a lease, petitioner experienced a negative cash flow because it paid more to the bank in principal and interest than it received from its lessee.

All of petitioner's leased vehicles were titled in petitioner's name. However, if a vehicle was given as security for a bank loan, then legal title was registered in the name of the bank. Petitioner generally borrowed money in the amount of the purchase price of the vehicle; in addition, to meet its cash flow requirements, petitioner frequently borrowed on the security of its wholly owned vehicles.[4]

The parties submitted into evidence a representative open-end lease called a Motor Vehicle Lease. Paragraph 14-D of the lease stated, "This is an agreement of lease only. Lessee has no title or interest in said cars, but is entitled to possession while he is not in default."

The lease schedule of the "Motor Vehicle Lease" provided for the year, make, and model of the vehicle to be leased; the total rent, tax on rent, monthly rent, and monthly reserve; the term of the lease and insurance premiums if procured through, or provided by, the lessor.

---

[4]An examination of 14 such security agreements submitted into evidence reveals that the amount borrowed was in the majority of cases identical to the cost of the vehicle to the lessor.

Paragraph 5 of the lease schedule set forth the monetary terms of the agreement.[5] Line 5(a), the capitalized cost figure, included the cost to petitioner of purchasing the vehicle plus a portion of the profit. Petitioner's practice was to negotiate this dollar amount with the lessee, thus the profit margin varied from transaction to transaction. Line 5(b) specified the portion of the monthly rental payments allocated to a depreciation reserve. This amount reduced the capitalized cost and always equaled the capitalized cost less the accumulated monthly reserve as determined in line 5(d). Line 5(c) was the portion of the monthly payments not credited to the depreciation reserve. This amount was calculated by multiplying the cost of the vehicle by a factor which took into account the average cost to petitioner of borrowing money, overhead expense, and profit. Line 5(d) stated the residual value of the vehicle at the end of the lease term. This projection was based on the lessee's anticipated use of the vehicle, including mileage, over the term. It represented the maximum amount for which the lessee would be liable to Leslie Leasing at the end of the term and was negotiated with the client.

The lease agreement provided that the capitalized cost was the agreed value of the car, and that the lessee's reserve was the agreed monthly reserve for depreciation of the leased vehicle. It provided for a lease term of not less than 6 months from the date of delivery plus any extended term.

During the years in issue, the company made the manufacturer's warranty available to lessees for repairs within the warranty period. Under the terms of the stipulated form lease, lessees were responsible for all operating and maintenance expenses.[6] However, they could elect one of two types of

---

[5]Pars. 5(a) through 5(d) provided:

    (a)   Value of motor vehicle (capitalized cost) ............. $_____

    (b)   Total amount of periodic payments to be credited to lessee in establishment of any liability at end of lease period ( ___ months × $_____ ) ........................ _____

    (c)   The total amount of periodic payments not so credited ( ___ months × $_____ ) .................. _____

    (d)   The maximum for which lessee could be liable at end of lease period: (a) minus (b) .......................................... _____

[6]In the event that, through custom of the trade in securing wholesale bids, petitioner had to warrant the mechanical condition of the engine block, transmission, and differential of

maintenance riders under which, for an additional periodic charge, petitioner would pay the maintenance expenses of the leased vehicle.[7] Approximately 15 percent of petitioner's lease agreements included a maintenance rider. Although Leslie Leasing, itself, did not repair cars, it authorized purchase orders for the repair of leased vehicles against its accounts.

Paragraph 8 of the form lease also required lessees to pay sales and use taxes, excise taxes, personal property, and other ad valorem taxes.

Under the stipulated form lease, the lessees agreed to insure the vehicle for comprehensive, collision, public liability, and property damage. As owner of the vehicle, petitioner was named as additional insured. If a lessee allowed this insurance coverage to lapse, the company could purchase coverage in the lessee's name and charge additional rent to pay the premiums. In addition, petitioner maintained two policies on its cars and trucks, a $500,000 contingent liability policy for bodily injury and property damage, and a $5 million liability umbrella policy. This coverage protected the company against the possibility of a lessee's coverage lapsing. It covered only bodily injury and property damage to others but did not protect against damage to petitioner's vehicles.

Paragraph 7 of the stipulated lease set forth terminal rental adjustment procedures.[8] At the expiration of the lease term,

---

the returned vehicle, and a used-vehicle purchaser later made a claim under the warranty, the lessee was required to reimburse petitioner for money paid in satisfaction of the claim.

[7] Under one plan, petitioner provided complete maintenance, including the replacement of tires as needed, for a fixed monthly sum. A second rider provided for a maintenance account in the lessee's name to which the lessee would make a monthly payment. If the costs of keeping the vehicle in good repair exceeded the balance in the account, the lessee would be billed for the difference.

[8] Par. 7 of the lease provided:

7. TERMINATION, REFUND OR ADDITIONAL RENTAL.

(a) Lessor, upon return or repossession of lease car, for any reason, prior to or at expiration of lease term or any extended term, will secure one or more wholesale bids on such car. Lessor may be one such bidder. If the high bid exceeds the capitalized cost reduced by Lessee's reserve accumulated for the number of months rent has been paid or is due from Lessee, such excess will be credited to Lessee's account with Lessor, and if there is a credit balance in said account, such amount will be refunded to Lessee. If high bid is less than the capitalized cost reduced by Lessee's reserve, accumulated for the number of months rent has been paid or is due from Lessee, Lessor will inform Lessee by telephone, telegraph, or in writing, of the amount of such high bid, and the difference due thereunder. The Lessee shall have two business days to approve or disapprove of such bid. If Lessee fails to notify Lessor in writing of his disapproval of such bid, then said bid is the agreed depreciated value of said car, and such failure to communicate is authority to Lessor to sell the car at the high bid.

petitioner would secure one or more wholesale bids. Petitioner, itself, might be one such bidder. If the high bid exceeded the residual value, the lessee would receive either a credit against the capitalized cost of his next leased vehicle or, occasionally, a cash refund. If less than the anticipated residual value, the lessee had 2 days to disapprove the bid. Failing such disapproval, the bid would be deemed the agreed depreciated value of the car, whether the car were sold immediately or not, and the lessee would be billed for the difference between the high bid and the residual value.

If the lessee disapproved the high bid, he had two stated options: he could resume the lease after paying any rental or other charges due; alternatively, he could secure cash bids for petitioner. As a third option, unannounced but apparently understood, he could purchase the vehicle by "paying off" the residual value assigned to it plus sales fee and accrued rents.[9] Rental adjustments in 1975 and 1976 were within 1 percent,

---

Nothing herein shall require Lessor to immediately sell the car, but Lessee shall receive credit for the net high bid. In the event that Lessee approves the sale at such high bid, or fails to disapprove such high bid, Lessee will pay to lessor the balance due after receiving credit for such high bid, together with any applicable sales or use taxes due, as additional rental.

(b) If the Lessee disapproves such high bid, and communicates such disapproval in writing to Lessor, Lessee may, if Lessor approves his credit (i) have the car returned to his possession after paying to Lessor any unpaid rental and any other charges due thereon, within five days of communication of his disapproval to Lessor, and the lease shall be resumed; or (ii) within five days after date of his communicated disapproval, secure bids for the account of Lessor, any such bid to be for cash, with name, address, or buyer, and amount of bid, to be delivered to Lessor within five days after receipt of bid.

(c) All sales shall be made for cash. "Net high bid" is defined as the amount for which car can be sold less 2% sales fee, less any expenses incurred for which Lessor would be liable, or which, if not paid, would constitute a lien on said car, in connection with the car, and sale thereof, from time of surrender or return of car to completion of sale.

(d) Notwithstanding any other provision of this lease, Lessor and Lessee agree that the foregoing provisions of this paragraph 7 setting forth the method of determining additional rental due, upon termination of this lease, or default thereof, by Lessee, shall be the damages due Lessor; as due to variation in the amount or rate of depreciation on any car, truck, or other equipment leased hereunder, it would be impractical or extremely difficult to fix actual damages.

[9]Pursuant to the lease agreement, the lessee might choose to terminate the lease at any time after 6 months from delivery of the vehicle. At that point, the company would adjust the residual value for the number of months the vehicle was used and secure net wholesale bids on the vehicle. As with leases running full term, the company would charge the customer for the difference between the two values, refund the balance, or offset the capitalized cost of the next leased vehicle.

plus or minus, of gross rental income, i.e., $50,000 or $50 per car on the average.

The investment credit was occasionally a subject of negotiation between petitioner and a lessee. In the few instances when it was passed through to customers, petitioner increased the lease fees.

In preparing this case, the parties selected 217 leases as a representative sample of the leasing transactions petitioner entered into in 1975 and 1976. One hundred eighty-five were open-end leases.[10] The following table summarizes the disposition of those vehicles: [11]

DISPOSITION OF VEHICLES

| | Open-end | |
| --- | --- | --- |
| Disposition | Number | Percent |
| Sold wholesale ........................ | 52 | 28% |
| Sold to lessee ......................... | [1]62 | 34 |
| Re-leased ............................... | 19 | 10 |
| Still active ............................ | 17 | 9 |
| Sold retail ............................ | 16 | 9 |
| Rewritten ............................. | 10 | 5 |
| Assumed by third party .......... | 5 | 3 |
| Sold for insurance proceeds ...... | 2 | 1 |
| Used as demonstrator ............. | 1 | |
| Repossessed .......................... | 1 | 1 |
| Totals ............................ | 185 | [2]100 |

[1] Figure includes three leases that were rewritten during the years in issue and ultimately sold to the lessee.
[2] Percentages rounded to the nearest whole number.

When a car was returned to petitioner, the company had several options. It was not obligated to sell the car to the highest wholesale bidder; often, petitioner held the car, repaired it, then offered it to wholesale buyers or assigned it to the daily rental fleet. If petitioner decided to release the car or put it into the rental fleet, petitioner, itself, would make a net wholesale bid on the vehicle.

[10]No distinction was drawn between consumer-use and business-use leases. The remaining 31 were closed-end leases which are not in dispute. An additional one was the subject of petitioner's suit for wrongful conversion of title.

[11]The parties did not introduce any data with respect to open-end leases executed in 1973 and 1974.

On its 1975 and 1976 Federal income tax returns, petitioner claimed $46,323 and $55,003, respectively, in investment credit, including investment credit carryovers, on its open- and close-end leased vehicles. In his notice of deficiency, respondent disallowed the claimed investment credit in its entirety with the following explanation:

*Investment Credit*

Claimed investment credit, including investment credit carryovers claimed, is disallowed because the property does not qualify for the investment credit under section 38 of the Internal Revenue Code. The leases relating to the property on which investment credit is being disallowed are determined to be sales contracts.

## OPINION

We are confronted with the question whether in calendar years 1975 and 1976 petitioner is entitled to the investment tax credit provided in section 38, I.R.C. 1954,[12] for vehicles Leslie Leasing acquired for lease by its commercial and consumer customers. To be so entitled, petitioner must own the vehicles on which the credit is claimed. Petitioner has argued both at trial and on brief that it entered into bona fide leasing arrangements with its clients with respect to the vehicles. On the other hand, respondent argues that the vehicles were sold pursuant to conditional sales contracts notwithstanding that the transactions in form were cast as leases. For the reasons that follow, we hold for petitioner as to its commercial leases and for respondent as to the consumer leases.[13]

As a preliminary matter, we must decide whether the open-end leases petitioner negotiated for vehicles to be used in trade

---

[12]Sec. 48(a) defines sec. 38 property to include tangible personal property which may be depreciated and which has a useful life of at least 3 years.

[13]On brief the parties discussed at some length the characterization of automobile leasing transactions under California Consumer Protection Statutes, in particular, the Moscone Automobile Leasing Act of 1969, Cal. Civ. Code sec. 2985.7 through sec. 2985.93 (West 1974), the Rees Levering Act, Cal. Civ. Code sec. 2981 through sec. 2984.4 (West 1974), and various sections of the California Veh. Code. See generally Ayer, "Clearing the Smog Surrounding Consumer Auto Leasing," 6 Pac. L.J. 447 (1975). Bottini, "Automobile Leasing: Is the Moscone Act Really Protecting the Consumer?" 14 Santa Clara Law. 612 (1974). While State law may treat an individual as the owner of property for certain purposes, Federal law may deem the person not to be the owner for tax purposes. Our inquiry here is limited to the treatment of petitioner's leasing activities for Federal tax purposes.

or business or for the production of income were qualified motor vehicle agreements within the meaning of section 210, Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97–248, 96 Stat. 324, 447 (TEFRA). Respondent has conceded that the commercial leases herein that qualify under TEFRA are not conditional sales contracts. Second, we must decide whether petitioner's consumer or non-business-use leases were conditional sales contracts or true leases.

Section 210[14] of TEFRA prohibits the Internal Revenue Service from denying lease treatment to leased vehicles which are operated for business reasons on the ground that such leases contain terminal rental adjustment clauses. The provision applies on a retroactive basis to any open taxable year.[15] A qualified motor vehicle agreement is one which was entered into before enactment of any law or Treasury regulation which provides that any agreement with a terminal rental adjustment clause is not a lease. The lessor must be personally liable for the repayment of amounts borrowed to finance the leased

---

[14]SEC. 210. MOTOR VEHICLE OPERATING LEASES.

(a) IN GENERAL.—In the case of any qualified motor vehicle agreement, the fact that such agreement contains a terminal rental adjustment clause shall not be taken into account in determining whether such agreement is a lease.

(b) DEFINITIONS.—For purposes of this section—

(1) QUALIFIED MOTOR VEHICLE AGREEMENT.—The term "qualified motor vehicle agreement" means any agreement with respect to a motor vehicle (including a trailer)—

(A) which was entered into before—

(i) the enactment of any law, or

(ii) the publication by the Secretary of the Treasury or his delegate of any regulation,

which provides that any agreement with a terminal rental adjustment clause is not a lease.

(B) with respect to which the lessor under the agreement—

(i) is personally liable for the repayment of, or

(ii) has pledged property (but only to the extent of the net fair market value of the lessor's interest in such property), other than property subject to the agreement or property directly or indirectly financed by indebtedness secured by property subject to the agreement, as security for,

all amounts borrowed to finance the acquisition of property subject to the agreement, and

(C) with respect to which the lessee under the agreement uses the property subject to the agreement in a trade or business or for the production of income.

(2) TERMINAL RENTAL ADJUSTMENT CLAUSE.—The term "terminal rental adjustment clause" means a provision of an agreement which permits or requires the rental price to be adjusted upward or downward by reference to the amount realized by the lessor under the agreement upon sale or other disposition of such property.

[15]H. Rept. 97–760, at 489 (1982).

vehicles or have pledged property to secure repayment other than the property subject to the lease.

Discussing the reason for the provision, the Senate Finance Committee report states:

> The committee bill will prevent the IRS from retroactively denying lease treatment for certain motor vehicle leases, including leases of trailers, by reason of the fact that those leases contain terminal rental adjustment clauses that require or permit the rental price to be adjusted upward or downward by reference to an amount realized by the lessor upon sale or other disposition of the property. The committee bill does not address the legal effect of these clauses and does not prevent the Treasury from issuing rules on a prospective basis addressing the legal effect of these clauses.
>
> The provisions of the committee bill regarding terminal rental adjustment clauses apply only to operating leases in which the lessee uses the property for business, as opposed to personal purposes. For this purpose, a lease is an operating lease if the lessor acquires the property with cash or recourse indebtedness. Thus, the provision does not apply to leveraged leases financed with nonrecourse debt.
>
>       \*      \*      \*      \*      \*      \*      \*
>
> The committee bill otherwise does not affect the general principles for determining lease treatment under pre-ERTA rules or the requirements of Revenue Procedure 75–21. Thus, as under present law, the lessee may not hold title to or have an equity interest in the property. To be entitled to depreciation deductions, the lessor must show a profit from the transaction independent of tax benefits. In addition, the lessor must retain other meaningful indicia of ownership to establish that the lessor is in substance the owner of the property.

S. Rept. 97–494 (Vol. 1) at 139 (1982). See also H. Rept. 97–760, at 488–489 (1982). This provision was proposed in the House of Representatives in reaction to an Internal Revenue Service technical advice memorandum issued by the National Office in December 1979, LTR 8019120. The Revenue Service took the position that the inclusion of a terminal rental adjustment clause in a motor vehicle lease caused the lease to be treated as a conditional sales contract, notwithstanding its longstanding audit position that recognized such clauses as true leases.[16]

---

[16]"Terminal rental adjustment clauses have been used by the motor vehicle fleet leasing industry for more than 30 years to insure that rental payments during the course of a lease reflect the true cost of using the vehicle during the period in question. These clauses provide a means of adjusting the total rental price of a leased vehicle, either upward or downward or both, at the end of the lease or actual use by the lessee to reflect the amount realizable by the lessor upon sale or other disposition of the vehicle. The presence of such clauses in the standard industry lease has for three decades protected the lessor's interest in the salvage value of his fleet against neglect or abuse by lessees. Similarly, a rental adjustment clause

The policy change was made without notice to the public or opportunity for public comment.

Turning to petitioner's open-end lease agreements, we have found that 85 percent were for commercial use and that Leslie Leasing was liable for amounts borrowed to finance the acquisition of the underlying vehicles. Petitioner owned 10 percent of its vehicles outright and financed the remainder on the strength of its credit standing, but never in excess of the fair market value of its interest in the property. During the period in issue, from 1973 to 1976, there were no laws or Treasury regulations[17] which would prohibit treating petitioner's open-end commercial agreements as leases. We conclude that these agreements were qualified motor vehicle leases as defined in section 210 of TEFRA. Accordingly, petitioner is entitled to the investment tax credit for vehicles leased to commercial users[18] in 1975 and 1976, as well as investment credit carry-overs on these vehicles for 1973, 1974, and 1975.

A different result obtains as to petitioner's non-business-use leases. The Court is not without guidance on this issue for *Swift Dodge v. Commissioner*, 76 T.C. 547 (1981), revd. 692 F.2d 651 (1982), presents a closely analogous fact pattern to the case at bar. *Swift Dodge* concerned an automobile dealership that, in addition to sales activities, purchased motor vehicles for use by third parties. It entered into agreements under which the vehicle users had many of the same responsibilities as those in the instant case, including the payment of taxes, licensing, and

---

enables a lessee to reap the rewards of turning in a vehicle in such good condition that its resale value exceeds the parties' original salvage value estimate. [128 Cong. Rec. E 2165 (daily ed. May 12, 1982) (remarks of Representative Holland).]"

[17]But see sec. 1.168(f)(8)–12, Proposed Regs., 47 Fed. Reg. 52730 (Nov. 23, 1982), which provides that the Revenue Service will not treat as a lease one entered into for trade or business or production of income which contains a terminal rental adjustment clause. The regulation, if adopted, will apply to any "motor vehicle agreement" entered into after Nov. 23, 1982.

[18]But see *Swift Dodge v. Commissioner*, 692 F.2d 651 (9th Cir. 1982), revg. 76 T.C. 547 (1981), wherein the Ninth Circuit found that similar transactions entered into in 1974 and 1975 were conditional sales contracts. Normally, we would apply the rule of *Golsen v. Commissioner*, 54 T.C. 742, affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971), since appeal from the decision herein would lie in the Ninth Circuit. Under *Golsen*, we will follow a decision of a Court of Appeals to which a case before us is appealable and which is squarely on point with our case. However, since sec. 210 of TEFRA retroactively applies to any open taxable year, the statute governs the outcome of this issue rather than the decision of the Court of Appeals which did not consider the new provision.

registration fees; operating and maintenance expenses; insurance premium costs; and the risk of depreciable loss.[19] There, as here, the manufacturer's vehicle warranty was made available to the vehicle user. Like the users in the instant case, customers of Swift Dodge might realize appreciation in the value of the vehicle by paying in cash the depreciated value of the vehicle and retaining it for their own purposes. The agreements did not restrict the use of the vehicles for trade or business or the production of income. During the years in issue, between 33 percent and 43 percent of those customers paid off the depreciated value of the vehicle and received title to it.

The parties in *Swift Dodge* approached the problem by analyzing the benefits and burdens of ownership. Respondent argued that the party who bore the risk of depreciable loss was the true owner of the property. Since under the terms of the agreement the user was responsible for any shortfall between market value and depreciable value, he or she bore the risk of decline in value. Such risk shifting, respondent asserted, amounted to a conditional sale rather than a lease. We rejected respondent's position, noting that under the decided cases, the risk of fluctuation in the residual value of leased property is only one factor among many to be examined in determining whether a contract is, in substance, a lease or a conditional sales agreement. We stated,

> In making our determination, we are concerned with the economic substance of the transactions in the case at bar. Upon normal termination of the "Lease Agreement," the motor vehicle user was responsible for returning to petitioner a vehicle worth at least the stated "depreciated value." If unable to fulfill this obligation when returning the vehicle, the user had the additional duty of paying to petitioner the difference in the values. Yet, if the user were astute, pursuant to petitioner's unannounced business practices, the user could pay in cash this depreciated value and retain the car for his own purposes. Because the depreciated value was a reasonable projection of the fair market wholesale value of the particular vehicle upon lease termination, if the user retained the car, paid the petitioner the stated wholesale value, and sold the car to a third party at retail, he could have offset any potential loss attributable to fluctuation in the vehicle's residual value. In our view, the inclusion of a contract provision that shifts the

---

[19]This was defined as the gamble that upon normal termination of the agreement the market value of the vehicle would be lower than the depreciable, or residual, value stated in the agreement.

depreciable loss to the extent of wholesale value away from the taxpayer in an attempt to minimize business risks does not control for purposes of determining whether the agreement is a lease or conditional sales contract. [76 T.C. at 569; fn. ref. omitted.]

See also *Lockhart Leasing Co. v. Commissioner*, 446 F.2d 269 (10th Cir. 1971), affg. 54 T.C. 301 (1970); *Northwest Acceptance Corp. v. Commissioner*, 58 T.C. 836 (1972), affd. per curiam 500 F.2d 1222 (9th Cir. 1974).

On appeal, the Ninth Circuit reversed our holding. *Swift Dodge v. Commissioner*, 692 F.2d 651 (9th Cir. 1982). It found that the allocation of duties in the agreement was no different from that under a conditional sales contract. For example, it compared Swift Dodge's duty to secure a high wholesale bid at the termination of the agreement to a seller's duty to mitigate damages before suing the buyer for a deficiency in an installment sale in California. See Cal. Civ. Code sec. 2983.2 (West 1974); *Hill v. Dominquez*, 138 Cal. App. 2d 891, 291 P.2d 203, 204 (1955). It found that the parties' legal rights were essentially the same rights they would have enjoyed under a typical conditional sales contract. For example, Swift Dodge retained legal title to its vehicles and could assign users' payments to third parties. If the agreement were prematurely terminated, Swift Dodge could repossess the vehicle and attempt to sell it. Those rights, as well as the user's informal understanding that he could keep the vehicle at expiration of the agreement if he paid off the vehicle's depreciated value, the Court stated, were no different from those of a purchaser and a seller under a conditional sales contract.

The Court also analyzed the parties' risks and found that they were the same as those of parties to a conditional sale. The user bore the risks of damage, theft, destruction and, most important, the risk of depreciation. By contrast, the only risk the dealership assumed was the risk of the user's default, a risk similar to that assumed by the holder of a security interest in a conditional sale. Swift Dodge, the Court found, incurred a loss only when the sale of the vehicle produced less cash than the amount owed. Having examined the benefits, rights, and obligations of the parties, the Court concluded that Swift Dodge did not retain significant and genuine attributes of a lessor. *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978).

Because the facts in the instant case are markedly similar to those in *Swift Dodge*, and as the Congress has not spoken regarding consumer leases, we are constrained to follow the holding of the Ninth Circuit respecting petitioner's non-business-use "lease" agreements. *Golsen v. Commissioner*, 54 T.C. 742, 756–757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). We leave to another day consideration of our position where the constraints of *Golsen* are not present.

Accordingly, petitioner is not entitled to investment credit in 1975 and 1976, or investment credit carryovers for 1973, 1974, and 1975 on these vehicles.[20]

*Decision will be entered under Rule 155.*

_____

[20]Petitioner also assigned as error respondent's failure to allow a correlative reduction in gross income on account of proceeds received by petitioner in 1975 and 1976 from leases entered into in prior years. Our holding renders this issue moot with respect to the commercial leases. As to petitioner's consumer leases, the parties have agreed to sever the issue for trial and/or Rule 155 computation at a later date.