T.C. Summary Opinion 2010-100

UNITED STATES TAX COURT

ARTHUR E. AND CONNIE M. BOYCE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 26288-08S.              Filed July 26, 2010.

Arthur E. and Connie M. Boyce, pro sese.

<u>John D. Davis</u>, for respondent.

GERBER, <u>Judge</u>:  This case was heard pursuant to the
provisions of section 7463 of the Internal Revenue Code in effect
when the petition was filed.[1]  Pursuant to section 7463(b), the
decision to be entered is not reviewable by any other court, and

---

[1]Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the year in issue.

this opinion shall not be treated as precedent for any other case.

Respondent determined an $8,939 deficiency in and a $61 addition to petitioners' 2004 Federal income tax. After concessions, the sole issue for decision is whether petitioners are entitled to a section 179 expense deduction.

## Background[2]

Petitioners resided in Idaho when they filed their petition. During 2004 petitioners acquired the use of a 2004 Ford Expedition (truck) from Dan Wiebold Ford, Inc. (Dan Wiebold), for business purposes. The truck had a gross capitalized cost of $43,745 and an adjusted capitalized cost of $39,518.53. The contract between petitioners and Dan Wiebold was entitled "MOTOR VEHICLE LEASE AGREEMENT--CLOSED-END" and called for monthly fixed payments of $607.06 over a 48-month term. The amount of the monthly payments was based on estimated depreciation of $22,256.53 and an estimated residual value of $17,262. The contract permitted petitioners to drive the truck only 11,294 miles per year and imposed an 18-cents-per-mile fee for any mileage in excess of that amount (excess mileage fee). Petitioners were required to maintain the truck, have all necessary repairs made, provide insurance coverage, and pay all

---

[2]The parties' stipulation of facts and the attached exhibits are incorporated by this reference.

taxes imposed in connection with the truck. At the end of the 48-month term, petitioners had the right to make a fixed payment of $17,612 to acquire unconditional ownership of the truck (option). In the event petitioners did not exercise that option, they were required to pay a $395 termination fee instead.

Petitioners timely filed a Form 1040, U.S. Individual Income Tax Return, for 2004. On the tax return, petitioners claimed a $28,749 section 179 expense deduction with respect to the truck.

In an October 10, 2008, notice of deficiency respondent determined, among other things, that the truck was not a depreciable asset and that petitioners were therefore not entitled to a section 179 deduction. On October 28, 2008, petitioners timely filed a petition with this Court.

## Discussion

Section 179 allows a taxpayer to elect to treat the cost of section 179 property as a current expense in the year the property is placed in service. See sec. 179(a). In order to deduct a section 179 expense related to the truck, petitioners must be the owners of the truck.

Petitioners contend that they were the owners of the truck in 2004 because the contract produced a conditional sale rather than a lease. Conversely, respondent contends that petitioners' transaction was a lease, both in substance and form.

The parties disagree about the approach that the Court should use to characterize the transaction. Respondent suggests we focus on Rev. Rul. 55-540, 1955-2 C.B. 39, whereas petitioners ask us to focus on Rev. Proc. 2001-28, 2001-1 C.B. 1156. While both may provide us with helpful guidance in reaching our decision, we are not obligated to adhere to either one.

The attributes of a lease and a sale are often the same or similar, sometimes blurring the distinction between them. Many factors (including petitioners' obligation to maintain and repair the truck, carry insurance, and pay all associated taxes) may be consistent with either a sale or a lease. See Kanetzke v. Commissioner, T.C. Memo. 1991-152 ("some of these burdens are of the type that might normally be required of a lessee as security or for protection of the interests of a lessor. And while it is true that bearing all these expenses may be indicative of ownership * * * that circumstance is not conclusive." (Citation omitted.)).

In the line of cases involving the issue of whether a "lease" is in fact a conditional sale, two important considerations emerge:

> First, if the nominal lessor "retains significant and genuine attributes of traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes." Frank Lyon Co. v. United States, 435 U.S. 561, 584 (1978). However, if the benefits, obligations, and rights of the putative lessor are essentially those of a secured seller, the substance of the arrangement must govern and it will be deemed a sale for tax purposes. Swift Dodge

v. Commissioner, 692 F.2d 651 (9th Cir. 1982), revg. 76 T.C. 547 (1981); Smith v. Commissioner, 51 T.C. 429, 438-439 (1968). [Fn. ref. omitted.]

Aderholt Specialty Co. v. Commissioner, T.C. Memo. 1985-491.

The lessor's benefits, obligations, and rights resemble those of a secured seller where: (1) The lease term extends throughout the equipment's entire useful life, Mt. Mansfield Television, Inc. v. United States, 342 F.2d 994 (2d Cir. 1965); (2) the lease is an open-end lease,[3] Swift Dodge v. Commissioner, 692 F.2d 651 (9th Cir. 1982), revg. 76 T.C. 547 (1981); Leslie Leasing Co. v. Commissioner, 80 T.C. 411 (1983); (3) title automatically passes to the lessee upon conclusion of the lease or when the sum of the rental payments equals the cost of the equipment, Chicago Stoker Corp. v. Commissioner, 14 T.C. 441 (1950); (4) the lessee has an option to purchase the equipment at a nominal or below-market price, Transamerica Corp. v. United States, 7 Cl. Ct. 441 (1985); Van Valkenburgh v. Commissioner, T.C. Memo. 1967-162; or (5) the lessor has an option to compel the lessee to purchase the equipment, Aderholt Specialty Co. v. Commissioner, supra.

---

[3]"Whether a lease is open-end or closed-end depends on who assumes the risk fluctuation in residual value of the leased property when the lease terminates. When the lessee assumes the risk, the lease is called open-end; otherwise, it is a closed-end lease." Leslie Leasing Co. v. Commissioner, 80 T.C. 411, 413 n.3 (1983).

Here, none of these elements is present. The term of the lease was less than the useful life of the truck. The record does not establish the truck's precise useful life, but the fact that the parties expected it to have a residual value of $17,262 (approximately 39.5 percent of the truck's gross capitalized cost) indicates that the truck would not reach its salvage value at the conclusion of the lease. The contract was not an open-end lease requiring petitioners to compensate Dan Wiebold for any unanticipated depreciation at the conclusion of the lease, and petitioners were required to pay a nominal $395 termination fee regardless of the truck's actual residual value. The contract did not confer title to the truck on petitioners. Petitioners could acquire title only if they exercised their option to purchase the truck. The option price of $17,612 was not a nominal amount because it exceeded the truck's estimated residual value and represented approximately 40.3 percent of the truck's gross capitalized cost. Thus, at the time the contract was signed, there was no certainty that petitioners would exercise the option.

In similar cases involving closed-end leases where the lessees had not assumed the risk of depreciation, courts have held the disputed transactions to be leases. See Nw. Acceptance Corp. v. Commissioner, 500 F.2d 1222 (9th Cir. 1974), affg. 58 T.C. 836 (1972); Lockhart Leasing Co. v. United States, 446 F.2d

269 (10th Cir. 1971); <u>Estate of Thomas v. Commissioner</u>, 84 T.C. 412 (1985).

In addition, the contractual limitation on the annual use of the truck bears heavily against characterizing the contract as a conditional sale agreement. Petitioners were required to pay 18 cents per mile for any mileage in excess of 11,294 miles per year, and there is no reason a purchaser would be subject to such a restriction. The excess mileage fee does not shift the risk of depreciation to petitioners because it is substantially less than the rate of depreciation factored into petitioners' monthly payments (approximately 49.3 cents per mile).[4] Dan Wiebold thus remained responsible for approximately 63.5 percent of the depreciation caused by any excess mileage. In addition, Dan Wiebold was completely responsible for <u>any</u> unexpected decrease in the truck's residual value which was not caused by excess use of the truck (e.g., a general decline in the resale value of Ford trucks, poor economic conditions, etc.). A secured seller would not bear such risks.

An argument can be made that petitioners could conceivably have driven the truck so that the total excess mileage fee would have exactly equaled the truck's estimated residual value. In

---

[4]The depreciation rate of 49.3 cents per mile was computed by dividing $22,256.53 of depreciation by the maximum allowed mileage of 45,176 miles during the life of the contract.

that case, petitioners would, in effect, have completely borne the additional $17,262 of depreciation.

However, the terms of the contract indicate that petitioners and Dan Wiebold did not consider this a reasonable possibility. Petitioners would have had to drive the truck for 95,900 excess miles in order for the total excess mileage fee to equal $17,262. In petitioners' best-case scenario, this would amount to a total of 107,194 miles.[5]  But at the 49.3-cents-per-mile rate of depreciation provided for in the contract, petitioners and Dan Wiebold expected the truck to be completely worn out at 80,214 miles.

Even if petitioners were able to drive the truck for 95,900 excess miles, the mere existence of such a possibility does not establish petitioners' ownership of the truck because it does not directly address the risk of depreciation.  Dan Wiebold, under the agreement, substantially bore the economic benefits and burdens of the excess mileage.  For example, in any of the situations where petitioners' excess mileage amounted to less than 95,900 excess miles, Dan Wiebold would have been left with a truck worth less than $17,262 and would have shouldered 63.5 percent of the difference between the truck's estimated and actual residual values.  In any of the situations where

---

[5]All 107,194 miles were driven in a single year and zero miles driven in the other 3 years.

petitioners' excess mileage exceeded 95,900 excess miles, Dan Wiebold would have enjoyed the resulting windfall profit. In either case, Dan Wiebold was responsible for the consequences of any excess mileage and therefore held the <u>risk</u> of depreciation.

Accordingly, we hold that the contract is a lease agreement and that petitioners are not entitled to the claimed section 179 expense deduction.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.